HINES, Major Field Artillery U. S. Army, v. MIKELL.

(Circuit Court of Appeals, Fourth Circuit. April 11, 1919.)

No. 1684.

1. HABEAS CORPUS ⬤⟿54—SUFFICIENCY OF PETITION.

Where a petitioner for writ of habeas corpus is confined under a statute containing a number of provisions, on any one of which he may be detained, the petition must clearly set forth each provision, and must aver that neither of them applies to him.

2. WAR ⬤⟿32—COURTS-MARTIAL—CIVILIANS AMENABLE TO JURISDICTION—RETAINERS WITH ARMIES "IN THE FIELD."

In Articles of War, Rev. St. § 1342, art. 2(d), as amended by Act Aug. 29, 1916, § 3 (Comp. St. § 2308a), providing that "in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field" shall be subject to military law, the phrase "in the field" is used in its technical military sense, and includes forces in cantonments or training camps within or without the United States.

[Ed. Note.—For other definitions, see Words and Phrases, In the Field.]

3. ARMY AND NAVY ⬤⟿28—"POST"—"GARRISON."

A "post" or "garrison" is the permanent home of the army in time of peace, where soldiers are given proper training with a view of having them prepared for the intelligent performance of duty in event of conflict.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Post.]

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Habeas corpus by William E. Mikell against F. H. Hines, Major Field Artillery, United States army. Judgment granting writ, and respondent appeals. Reversed.

For opinion below, see 253 Fed. 817. Certiorari denied 250 U. S. ——, 39 Sup. Ct. 494, 63 L. Ed. ——.

Francis H. Weston, U. S. Atty., of Columbia, S. C., and M. J. Dougherty, 1st Lieut. F. A., U. S. Army, of Mesa, Ariz., Trial Judge' Advocate (J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C., and Capt. W. L. Martin, of Montgomery, Ala., Trial Judge Advocate, on the brief), for appellant.

R. Beverley Herbert and H. N. Edmunds, both of Columbia, S. C., for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This was a habeas corpus proceeding tried in the United States District Court for the Eastern District of South Carolina. The facts may be epitomized as follows:

On or about July 22, 1917, William E. Mikell, a civilian, on his personal application, was employed by the quartermaster at Camp Jackson in the capacity of a stenographer.

Camp Jackson is a cantonment located near Columbia, S. C., established under the authority of the National Defense Act, approved June 3, 1916, c. 134, 39 Stat. 166, and amendments thereto. This camp was established for the training of the military forces of the United States for service in the theater of operations overseas.

Mikell continued in his employment until on or about March 15, 1918, when again, upon his personal application, he was employed as auditor of the constructing quartermaster's office, and his employment at such cantonment was continuous until his arrest and confinement, followed by his discharge on or about September 25, 1918. After he was arrested he was confined in the prison stockade, Camp Jackson, under order of the commanding general, charged with violation of the 94th Article of War (Comp. St. § 2308a).

Before he could be brought to trial by court-martial, he was released and discharged from military confinement, on a petition for writ of habeas corpus, by the United States District Court for that district. The government took an exception to the judgment of the lower court, and the case comes here now on appeal.

The first and second assignments of error are in the following language:

"That his honor erred in overruling the demurrer interposed to the petition because the said petition failed to state sufficient facts to entitle the petitioner to a writ of habeas corpus, or to have a rule to show cause issued."

"That his honor erred in overruling the demurrer interposed to the petition because the petition failed to show that the petitioner was not subject to the jurisdiction of a military court-martial."

[1] Where one files a petition for habeas corpus it is incumbent upon him to show that his detention is unlawful; therefore, where as in this instance, one is confined under a statute containing a number of provisions, on any one of which he may be detained, the petition must clearly set forth each provision of the statute, and it must be averred that neither of them applies to him.

Among other things, the defendant stated the ground upon which he could not be lawfully held in the following language:

"That your petitioner is not an officer or soldier in any branch of the military or naval service of the United States, nor is your petitioner in any otherwise subject to the military laws of the United States, nor has he in any wise committed any breach of the same, nor does he reside within the confines of said Camp Jackson, but, on the other hand, resides at his own home, in the county of Richland, state aforesaid."

Inasmuch as these two assignments are closely related, we will consider them together. As we have stated, where there are a number of elements of a statute which may warrant the detention of the petitioner, it is incumbent upon him to negative each provision.

The petitioner states, among other things, that he is "not otherwise subject to military laws of the United States." This is a mere conclusion of law. However, we prefer not to base our decision upon the ground that the demurrer should have been sustained. The principal point involved in this controversy is as to whether the appellee is amenable to court-martial jurisdiction.

[2] The section upon which the defendant was sought to be prosecuted is subdivision (d) of article 2, § 1342, Revised Statutes, as amended by the act of August 29, 1916, c. 418, § 3, 39 Stat. 650, 651 (Comp. St. § 2308a), and is in the following language:

"All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

In order to correctly determine the matter in controversy, we must ascertain the true meaning of the foregoing section. In other words, was the appellee "serving with the armies of the United States in the field * * * in time of war"?

Appellee admits that he was serving with the army at the time of his dismissal from the service, and that he was within the territorial jurisdiction of the United States in time of war; but he contends that the army in which he was serving was not "in the field," within the meaning of the act under which he was held.

It is insisted by counsel for the government that when we come to determine the meaning of the words "in the field" we should ascertain whether they "possess a technical as well as a meaning of common acceptation, and whether they are to receive their common accepted meaning or are to be construed in accordance to their technical import."

The learned judge who tried this case in the court below, in referring to the meaning of the words "in the field," said:

"The ordinary meaning of the words 'field' or 'in the field,' with regard to military operations, means in the actual field of operations against the enemy; not necessarily the immediate field of battle, but the field of operations, so to say; the field of war; the territory so closely connected with the absolute struggle with the enemy that it is a part of the field of contest."

Is the interpretation placed upon this section by the lower court sufficiently broad to meet its requirements? Did the court interpret this section in the sense in which it is employed by military authorities? In other words, have not these words acquired a peculiar and appropriate meaning in the language of war? From the very nature of things, we think they should be given their technical meaning.

We find in 36 Cyc. 1118, the following:

"Terms of art, or technical words and phrases used in a statute," that "have acquired a peculiar and appropriate meaning in the law, must be interpreted in accordance with their received meaning and acceptation with the learned in the art, trade, or profession to which they belong, unless it clearly appears * * * that it was the intention of the Legislature to use them in a different sense."

[3] A post or garrison, properly speaking, is the permanent home of the army in time of peace, where soldiers are given proper training with a view of having them prepared for the intelligent performance of duty in the event of a conflict; and in case of war, when the army leaves the post and moves in the direction of the enemy, or to some intermediate point where they may temporarily stop for training, would it not be more reasonable to say that they were then "in the field"?

In the United States Army Regulations (paragraph 193 et seq., p. 48) it is provided for field service in time of peace:

"In time of peace a department commander is charged, under direction of the War Department, with the duty of preparing for war all the troops and all the military resources of his department, and with the administration of all the military affairs of his department, except as otherwise prescribed by army regulations or existing orders. * * * He will annually concentrate his tactical division, or portions thereof, and secure for himself, and his division staff, as much practice as possible in the actual handling and supply of troops in the field. * * * The object of such inspections is to determine the preparedness of organizations for war service, and the capacity of brigade commanders and all other officers for the exercise in the field of command appropriate to their rank. With this object constantly in view, the character of the inspection may be varied by the department commander, and any exercise may be required which may be necessary to arrive at definite conclusions and to justify positive recommendations; but tactical inspections will ordinarily embrace the following subject: * * *

"(i) Drill regulations; combat exercise appropriate to the size of the command.

"(j) Field fortification, including the reconnaissance, selection, and occupation of defensive positions, the actual construction of appropriate intrenchments, when practicable, and the rendition of reports, including the necessary sketches, based on standard publications and service manuals treating of the subject of field fortifications."

In Infantry Drill Regulations, United States Army (page 10), the distinction between garrison and "in the field" is recognized in the following language:

Field exercises are for instruction in duties incident to campaign. Assur... situations are employed. Each exercise should conclude with a discussion the ground of the exercises and principles involved.

The combat exercise, a form of field exercise of the company, battalion, and larger units, consists of the application of tactical principles to assumed situations, employing in the execution the appropriate formations and movements of close and extended order.

Combat exercises must simulate, as far as possible, the battle condition assumed. In order to familiarize both officers and men with such conditions, companies and battalions will frequently be consolidated to provide war-strength organizations. Officers and noncommissioned officers not required to complete the full quota of the units participating are assigned as observers or umpires.

The firing line can rarely be controlled by the voice alone; thorough training to insure the proper use of prescribed signals is necessary.

The exercise should be followed by a brief drill at attention in order to restore smartness and control.

In field exercises the enemy is said to be "imaginary" when his position and force are merely assumed; "outlined," when his position and force are indicated by a few men; "represented," when a body of troops acts as such.

The court below treated the term "in the field" as describing a place of contact with the enemy. It necessarily limits the term "in the field" to those who were in the theater of operations in the foreign service. We think that General Orders 6, 53, December 11, 1918, shows there is a required distinction between the term "in the field" and the places of contact with the enemy, in which reference is made to service chevrons as follows:

"A gold chevron of standard material and design, to be worn on the lower half of the left sleeve of all uniform coats, except fatigue coats, by each officer, field clerk, and enlisted man who has served six months *in a theater of operations* during the present war as an officer, field clerk, or enlisted man of the armies of the United States, and an additional gold chevron for each six months of similar service thereafter.

"A sky-blue chevron of the same pattern, and worn in the same manner as the gold chevron, by each officer, field clerk, and enlisted man who has served under the conditions prescribed for the gold chevron, but has left *the theater of operations* prior to the completion of six months' service therein. Should a person subsequently return to the theater of operations for duty therein, the blue-cloth chevron will be replaced by the gold chevron upon the completion of a total six months of service *in the theater* of operations, after which only gold chevrons will be worn to indicate war service. The right to wear war-service chevrons is limited to those officers, field clerks, and enlisted men whose official duty requires their presence in a theater of operations, as distinguished from those who may visit such a theater without having been ordered thereto for duty. The term 'theater of operations' is as defined in Field Service Regulations 1914, as corrected to April 15, 1917. * * *

"A silver chevron of the same pattern, and worn in the same manner as the gold chevron, by each officer, field clerk, and enlisted man who has served for six months during the present war outside the theater of operations, and an additional silver chevron for each six months of similar service thereafter. The silver chevron will not be worn by those required to wear either the gold or blue-service chevron.

"Chevrons of the same material and design and similarly placed will be worn on the coat, overcoat, or waist of their prescribed uniform by all other uniformed personnel of the authorized military establishment. They will be

worn under the same conditions as prescribed for officers, field clerks, and enlisted men."

In time of war, with some exceptions, practically the entire army "in the field," but not necessarily "in the theater of operations." This would be undoubtedly true in case of war within our borders, and we can conceive of no reason why the army in America engaged in training and preparing for service on the firing line overseas should not be considered and treated as a component part of the entire army, the majority of whom were actually engaged on the firing line. To maintain those who were "over there," it was necessary to have a reserve force located so near thereto as to be available in the case of an emergency, and during the war just ended it was very essential that they should continue to increase such reserve force under the selective draft, and in order to do this the individual had to be mustered into the service and undergo strict discipline and training so that he might render efficient service under the modern mode of warfare. It seems perfectly clear that from the moment he entered the service he was in every sense of the word a part of the army, and when he was taken to the cantonment he thereby was serving with the army "in the field," doing practically everything required of a soldier save that of engaging in actual combat. All the training he received was for the purpose, as we have stated, of qualifying him for the contest that was going on, as we all know, at a fearful rate.

If an individual during peace had enlisted at an army post he could not, so long as he remained there, in any sense of the word be deemed to be engaged in the service "in the field." However, those who entered the cantonment took the first step which was to lead them to the firing line, and they were then as much "in the field" in pursuance of such training as those who were encamped on the fields of Flanders awaiting orders to enter the engagement.

In the case of Sargent v. Town of Ludlow, 42 Vt. 726, the Supreme Court of that state said:

"That term 'in the field' has just as clear and well-defined a meaning when used with army service in a state of war as any other plain and well understood expression. 'Soldiers in the field,' 'veterans in the field,' 'men in the field,' 'army in the field,' 'officers in the field,' 'all mean persons in the military service for the purpose of carrying on the pending war.' "

In 1893 Congress by the act of February 27th of that year (chapter 168, 27 Stat. 480 [Comp. St. § 2122]) clearly indicated that the army may be "in the field" in time of peace, and passed an act giving them the right to hold their quarters, or to receive commutation in lieu thereof, when temporarily on duty in the field; and when war was declared with Germany many of the officers while engaged in the field were not entitled to quarters or commutation, etc., because they had not been assigned to such quarters or posts. Accordingly Congress on April 16, 1918, c. 53, 40 Stat. 530 (Comp. St. 1918, § 2118bb), in order to relieve the situation, passed an act which provides:

"That during the present emergency every commissioned officer of the army of the United States on duty in the field, or on active duty without the territorial jurisdiction of the United States, who maintains a place of abode for a

wife, child, or dependent parent, shall be furnished at the place where he maintains such place of abode, without regard to personal quarters furnished him elsewhere, the number of rooms prescribed by the act of March second, nineteen hundred and seven (Thirty-Fourth Statutes, page eleven hundred and sixty-nine), to be occupied by, and only so long as occupied by, said wife, child, or dependent parent; and in case such quarters are not available every such commissioned officer shall be paid commutation thereof and commutation for heat and light at the rate authorized by law in cases where public quarters are not available; but nothing in this act shall be so construed as to reduce the allowances now authorized by law for any person in the army."

From this statute it appears that Congress is of opinion that any portion of the army confined to field training in the United States should be treated as "in the field." There are other statutes almost too numerous to mention which clearly indicate that troops in cantonments in this country are "in the field." It is also significant that in May, 1918, the Secretary of War, through the Adjutant General, recognized the service in the various camps and cantonments "in the field," stating that officers stationed in these camps and cantonments were entitled to commutation of quarters, heat and light, for themselves and dependents.

The following excerpt is taken from the Bulletin of June 15, 1918, issued by the War Department:

"All duty with troops of any kind in the field, at home or abroad, during the present war, will be considered as not temporary duty in the field in contemplation of the act of Congress approved February 27, 1893, which provides that officers temporarily absent on duty in the field shall not lose their right to quarters commutation thereof at their permanent stations while so temporarily absent. Under this decision no officer or enlisted man on duty in the field can have any official station elsewhere, within the meaning and contemplation of the laws and regulations relating to the allowance of quarters or commutation thereof, but while on such duty his rights as to quarters will be as prescribed for field service. (2607909A, A. G. O.)"

We think, in view of the technical and common acceptation of the term, this question is not to be determined by the locality in which the army may be found, but rather by the activity in which it may be engaged at any particular time. This interpretation is fully sustained by the opinion of the Judge Advocate General, as follows: Ops. J. A. G. 6–124—.4, July 6, 1914; 24 Comp. Dec. 106; J. A. G. 248, 5, Apr. 2, 1918.

Judge Advocate General Holt on March 18, 1865, in the case of Dr. J. W. Bryan, a contract surgeon on general duty at a hospital at Beverly, N. J., who was charged with theft and violation of the 99th Article of War (Rev. St. § 1342), said:

"To restrict the term 'serving with armies of the United States in the field' to those persons only who may be employed with an army when immediately operating against the enemy would be a construction not in accordance with the spirit of our military law, and not in keeping with the necessities of our military establishment. In view of the constant and pressing exigencies of the military service, of the manifold duties which our officers and soldiers are called upon to perform, both at and away from the immediate front, and if the part that the troops themselves are assigned to perform, these indifferently, and under the same rules of discipline and code of laws, it is deemed not too much to hold that the entire army, as at present mobilized and actively employed for the prosecution of a Civil War and for the suppression of a vast

internecine rebellion, is an army in the field; and that all persons engaged with it, whether in the camp or at a station, upon services made regular and proper by the wants and circumstances of the military body, are triable by a court-martial within the provisions of this article."

There are numerous other cases of the same import, but we do not deem it necessary to cite them in order to sustain the view we take of this matter.

It is a matter of common knowledge that Camp Jackson is a temporary cantonment, where troops are assembled from the various sections for the purpose of training preparatory for service in the actual theater of war. To hold that a cantonment like this is not within military jurisdiction would handicap the military authorities, and greatly hinder and delay military operations, and would, in some instances, enable one employed in such capacity to successfully defraud the government without incurring any criminal liability whatsoever. We think that all persons serving there are strictly "in the field" and subject to military regulations. The statute under which appellee was indicted is evidently intended to regulate the conduct of civilians who might seek employment in any branch of the service. This provision is highly proper, and manifestly intended to secure honest and fair dealing on the part of those employed by the government and should be rigidly enforced.

For the reason stated we are of the opinion that the court below was in error in discharging the defendant; therefore the judgment of such court is reversed.