**UNITED STATES of America ex rel. Dominic Guagliardo, Appellant,**

v.

**Neil H. McELROY, Secretary of Defense, Department of Defense, et al., Appellees.**

**No. 14304.**

United States Court of Appeals District of Columbia Circuit.

Argued March 3, 1958.

Decided Sept. 12, 1958.

Mr. Michael A. Schuchat, Washington, D. C., for appellant.

Mr. John W. Kern, III, Assistant U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll, Asst. U. S. Atty., were on the brief for appellee.

Before EDGERTON, Chief Judge, and FAHY and BURGER, Circuit Judges.

FAHY, Circuit Judge.

Appellant was a civil service employee of the Department of the Air Force of the United States, employed as an elec-trical lineman at the Nouasseur Air Depot near Casablanca, Morocco. His duties were to maintain and repair airfield lighting and to inspect and repair electrical conduits, transformers, lights, controls, ducts, and manholes. He lived with his wife off the Depot, in nearby Casablanca. He was entitled to quarters allowance, mail, Commissary and Base Exchange privileges, a United States Air Force ration card, membership in the Air Force Officers Club, and medical and dental care at the Depot.

On July 18, 1957, he and two enlisted men [1] were charged with stealing certain leatherette goods and fabric material at the Depot, in violation of Art. 121, Uniform Code of Military Justice, 10 U.S.C. § 921 (Supp. V, 1958), and with conspiring to commit larceny, in violation of Art. 81, U.C.M.J., 10 U.S.C. § 881 (Supp. V, 1958). They were tried by a general court-martial and found guilty. Appellant was sentenced to pay a fine of $1,000 and to be confined at hard labor for three years.

In due course the case reached the Board of Review in the Office of the Judge Advocate General, pursuant to Art. 66 U.C.M.J., 10 U.S.C. § 866 (Supp. V, 1958). Appellant then petitioned the United States District Court for the District of Columbia for a writ of habeas corpus. He contended that the military authorities lacked jurisdiction to try him and that accordingly his confinement under the court-martial sentence was unlawful. Relief was denied by the District Court, opinion reported at 158 F.Supp. 171, followed by this appeal.[2]

Appellees [3] contend that the jurisdictional question is prematurely raised because appellant has not exhausted the judicial processes available to him under the Uniform Code of Military Justice. They rely upon Gusik v. Schilder, 340 U.

---

1. One or more civilian Moroccan nationals were also alleged to have been parties to the same transaction. They have been tried in the regular courts of Morocco.

2. We ordered appellant admitted to bail pending the appeal.

3. Neil H. McElroy, Secretary of Defense, James H. Douglas, Secretary of the Air Force, and General Thomas D. White, Chief of Staff, United States Air Force.

S. 128, 71 S.Ct. 149, 95 L.Ed. 146. But that case we think is inapposite, for there court-martial jurisdiction over the accused unquestionably existed since he was a member of the United States Army. He sought to attack collaterally a court-martial judgment because of alleged errors in the court-martial proceedings, without exhausting the administrative remedies available for their correction. Here, in contrast, the question is whether appellant is subject to court-martial jurisdiction at all. Habeas corpus proceedings were used to determine such a question in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, and United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8.[4] The point was not discussed, but in view of Gusik v. Schilder, supra, could not have been overlooked by the Supreme Court, especially as the Court in Reid v. Covert specifically noted that the petition was brought "while Mrs. Covert was being held * * * pending a proposed retrial by court-martial * * *." 354 U.S. at page 4, 77 S.Ct. at page 1224, 1 L.Ed.2d 1148. If appellees have no court-martial jurisdiction whatever over appellant the Great Writ is available to release him from their custody.

▮ Appellees defend their jurisdiction solely by reason of Art. 2, U.C.M.J., 10 U.S.C. § 802 (Supp. V, 1958). This provision in terms does extend court-martial jurisdiction to appellant for the offense charged. The provision reads:

"The following persons are subject to this chapter [The Uniform Code of Military Justice]:

* * * * * *

"(11) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons serving with, employed by, or accompanying the armed forces outside the United States * * *."

Appellant's contention is that this provision is unconstitutional as applied to him, a civilian employee, in time of peace.

The question thus raised must be decided in light of the decision of the Supreme Court in Reid v. Covert, supra. The Court there held that in a capital case the wife of a member of the armed forces, who accompanied her husband abroad and there killed him, could not be tried by court-martial—that Art. 2 subparagraph (11), supra, was unconstitutional as so applied. The basis for the decision was that the wife was entitled to a jury trial as provided by Art. III, § 2 of the Constitution and to the safeguards of the Fifth and Sixth Amendments.

Article III, § 2 of the Constitution provides that the trial of all crimes excepting cases of impeachment shall be by jury. The pertinent Fifth Amendment provision is that no person shall be held to answer for a capital or otherwise infamous crime unless upon presentment or indictment of a grand jury except in cases arising in the land or naval forces. The pertinent Sixth Amendment provision is that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed. None of these provisions was complied with in Reid v. Covert. And none was complied with in the present case.

Appellees point, however, as was done in Reid v. Covert, to Art. I, § 8, cl. 14, of the Constitution, which empowers Congress "to make Rules for the Government and Regulation of the land and naval Forces." It is urged that this provision, together with the Necessary and Proper Clause of the Constitution, Art.

4. Moreover, the highest court available under the Uniform Code of Military Justice has consistently upheld jurisdiction over persons in the same legal posture as appellant. Appellant should not be required to await a similar decision in his case. United States v. Wilson, No. 9638, U.S.C.M.A., March 28, 1958; United States v. Rubenstein, 7 U.S.C. M.A. 523, 22 C.M.R. 313; United States v. Burney, 6 U.S.C.M.A. 776, 21 C.M.R. 98; United States v. Marker, 1 U.S.C. M.A. 393, 3 C.M.R. 127.

I, § 8, cl. 18, has enabled Congress to establish the court-martial jurisdiction specified in subparagraph (11) of Art. 2, U.C.M.J., supra, by carving out exceptions to the application of Art. III, § 2 of the Constitution and of the Fifth and Sixth Amendments. Clearly the Constitution does authorize such an exception for members of "the land and naval Forces." But in Reid v. Covert the Chief Justice and Mr. Justice Black, Mr. Justice Douglas, and Mr. Justice Brennan, in the opinion written by Mr. Justice Black, would not permit an exception related to the "land and naval Forces" to include civilians unless in rare and unusual circumstances; and Mr. Justice Frankfurter and Mr. Justice Harlan would not permit such an exception to include a civilian wife charged with a capital offense, though accompanying her service husband with the forces outside the United States.

The same considerations, set forth elaborately in the opinions, which thus brought agreement among a majority of the Supreme Court as to the wife in Reid v. Covert, would not permit a civilian employee in the situation of appellant to be tried by the United States by court-martial on a capital charge. He would be entitled to a civilian trial by jury. We can think of no constitutional basis for approving the court-martial of such an employee for a capital offense which would not apply equally to Mrs. Covert. Of course the case before us is not a capital one, but if Mrs. Covert or an employee such as appellant could not be tried by court-martial on a capital charge, notwithstanding the provision of the Military Code purporting to authorize such a trial, the existing congressional plan for extending court-martial jurisdiction to persons accompanying or employed by the armed forces outside the United States exceeds constitutional bounds. Congress did not exclude capital cases. The statute embraces without exception persons "employed by" the forces outside the United States and thus would deprive all civilians in that category of the right to trial by jury for any offense defined in the Military Code, capital or noncapital, and regardless of the nature of the offense or of the relation of the offense or of the employment to the security, discipline, or effectiveness of the forces. The scope of Art. III, § 2 of the Constitution and of the Fifth and Sixth Amendments, as expounded in Reid v. Covert, prevents such a curtailment of trial by jury and concommitant extension of court-martial jurisdiction over civilians in time of peace.

This is not to say that legislation bringing some civilian employees within court-martial jurisdiction for some offenses would necessarily be unconstitutional. Cf. Reid v. Covert, 354 U.S. at pages 22–23, 77 S.Ct. 1222, 1 L.Ed.2d 1148. It is reasonable to assume that the fullness of the Necessary and Proper Clause, considered with the authority of Congress "to make Rules for the Government and Regulation of the land and naval Forces," and considered also with the present and potential responsibilities of the United States throughout the world, has not been exhausted. But Reid v. Covert plainly shows that these sources of legislative power do not sustain the all-inclusive extension of military jurisdiction over civilian employees attempted by subparagraph (11) of Art. 2 of the Military Code.

Since the intended broad sweep of subparagraph (11) is unconstitutional the question arises whether the courts should rewrite the provision along narrower lines and decide the question of its validity as applied to this particular employee for this particular offense. There are numerous instances in which the Supreme Court has held that such judicial reframing of legislation should not be attempted. Butts v. Merchants & Miners Transp. Co., 230 U.S. 126, 33 S.Ct. 964, 57 L.Ed. 1422; Howard v. Illinois Central R. Co., (Employers' Liability Cases) 207 U.S. 463, 496–504, 28 S.Ct. 141, 52 L.Ed. 297; Illinois Cent. R. v. McKendree, 203 U.S. 514, 515, 528–530, 27 S.Ct. 153, 51 L.Ed. 298; United States v. Ju Toy, 198 U.S. 253, 262–63, 25 S.Ct. 644, 49 L.Ed. 1040; James v. Bowman,

190 U.S. 127, 139–142, 23 S.Ct. 678, 14 L.Ed. 30; Baldwin v. Franks, 120 U.S. 678, 7 S.Ct. 763, 32 L.Ed. 766; United States v. Harris, 106 U.S. 629, 641–642, 1 S.Ct. 601, 27 L.Ed. 290; Trade Mark Cases, 100 U.S. 82, 98–99, 25 L.Ed. 550; United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563. See, also, Carter v. Carter Coal Co., 298 U.S. 238, 312–317, 56 S.Ct. 855, 80 L.Ed. 1160; Williams v. Standard Oil Co., 278 U.S. 235, 242, 49 S.Ct. 115, 73 L.Ed. 287; Yu Cong Eng v. Trinidad, 271 U.S. 500, 518–522, 46 S.Ct. 619, 70 L.Ed. 1059; Hill v. Wallace, 259 U.S. 44, 70, 42 S.Ct. 453, 66 L.Ed. 822.

In Reese the Court said:

"We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. * * *

* * * * * *

"To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty.

"We must, therefore, decide that Congress has not as yet provided by 'appropriate legislation' for the punishment of the offence charged in the indictment. * * *"

92 U.S. at page 221, 23 L.Ed. 563.

In the Trade Mark Cases, supra, the same principle is stated as follows:

"[I]t is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body."

100 U.S. at page 98, 25 L.Ed. 550.[5]

In Yu Cong Eng the opinion was by Mr. Chief Justice Taft and contains this language:

"The effect of the authorities we have quoted is clear to the point that we may not in a criminal statute reduce its generally inclusive terms so as to limit its application to only that class of cases which it was within the power of the Legislature to enact, and thus save the statute from invalidity."

271 U.S. at page 522, 46 S.Ct. at page 624, 70 L.Ed. 1059.

The case at bar is not one where Congress has laid down a definition of jurisdiction in terms taken from the Constitution, leaving administrative agencies and the courts to apply the definition by a process of inclusion and exclusion according to the facts of particular cases, as was N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30–31, 57 S.Ct. 615, 81 L.Ed. 893.

Appellees urge, however, that since the statute contains a severability clause the doctrine of the Reese and kindred cases does not apply. Section 49(d) of the Act of August 10, 1956, Public Law 1028, 84th Cong.,[6] 70A Stat. 640 provides:

"If a part of this Act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this Act is invalid in one or more of its applications, the part remains in effect in all valid applica-

5. While in Reese and the Trade Mark Cases the Court spoke of crimes defined so broadly as to be beyond constitutional authority, the principle invoked in those cases applies to this attempted extension of court-martial jurisdiction over crimes or persons in such broad terms as to be unconstitutional.

6. Public Law 1028 enacted into positive law Title 10 of the United States Code, containing, *inter alia,* the Uniform Code of Military Justice. The severability clause, though a part of Public Law 1028, was not enacted into Title 10. It can be found however in the note at page 293 of Supplement V of the 1952 Code (1958).

tions that are severable from the invalid applications."

As the Supreme Court held in Williams v. Standard Oil Co., 278 U.S. 235, 241–242, 49 S.Ct. 115, 73 L.Ed. 287, the general effect of a severability clause is to substitute for the presumption that the legislature intended its act to be effective as an entirety, the opposite presumption of severability; that is, that the legislature intended the act to be divisible. It is said that this presumption must be overcome by considerations which make evident the inseverability of the provisions of the statute, or the clear probability that with the invalid part eliminated the legislature would not have been satisfied with what remains. In Williams itself, though the statute was not penal and also contained a severability clause the Court said:

> "it requires no extended argument to overcome the presumption and to demonstrate the indivisible character of the act under consideration."

278 U.S. at page 242, 49 S.Ct. at page 117, 73 L.Ed. 287.

To the same effect is Hill v. Wallace, 259 U.S. 44, 70, 42 S.Ct. 453, 66 L.Ed. 822.

Other cases relied upon by appellees include Virginia Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Wright v. Vinton Branch Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; St. Louis, S. W. Ry. v. State of Arkansas, 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265; The Abby Dodge, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390; United States v. Delaware and Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836.

We do not think the severability clause authorizes us to divide subparagraph (11) so as to raise the question whether or not persons in appellant's situation might validly be subjected to court-martial jurisdiction. Though Reid v. Covert involved a wife and not a civilian employee, we know from that decision that the intended broad coverage of civilians, whether accompanying or employed by the forces abroad, exceeds constitutional bounds. Neither the severability clause nor any other provision affords any standard to guide a constitutional decision in the instant case except the invalid standard of "persons * * * employed by" the armed forces outside the United States. We do not know how to subdivide this provision as Congress might have done if Congress had known it could not be upheld as written. The present severability clause shows only a very general intention to leave in effect all valid applications which are severable from invalid applications, giving no indication of what valid applications Congress thought would be severable. Should we undertake to say that the "persons employed by" clause is divisible so as to apply to appellant we would be called upon to decide whether civilians in general employed by the armed forces outside the United States in time of peace are subject to court-martial jurisdiction. Four members of the Supreme Court in Reid v. Covert have said in effect that they are not subject to such jurisdiction; and a majority of the court has not indicated that they are.

The Supreme Court has repeatedly referred to "the wisdom of refraining from avoidable constitutional pronouncements." United States v. International Union Auto. Workers, 352 U.S. 567, 590, 77 S.Ct. 529, 541, 1 L.Ed.2d 563. This settled principle leads us to decide this case on the ground of nonseverability. Should we hold severable the application of the statute to appellant for the crime here charged, and go on to decide whether his conviction by court-martial was constitutional, obviously we would be deciding an important constitutional question. This course is not required and, therefore, should not be pursued in the circumstances of this case. The relevant precedents call for a decision on the basis spelled out in the Reese and kindred cases. Under those decisions we hold that subparagraph (11), which the Supreme Court has held is in-

valid as presently enacted, Reid v. Covert, is nonseverable into fragments which have not been specified by Congress or as to which Congress has not furnished criteria for a case-by-case judicial application. At least the application of the subparagraph to such a civilian as appellant, charged with such an offense as is here involved, cannot be validly carved out of the invalid general spread of that provision.

Our decision leaves Congress free if it so desires to rewrite the legislation with inclusion of criteria for court-martial jurisdiction in terms related more definitely to the security, discipline, and effectiveness of the armed forces abroad. Or Congress might decide in light of Reid v. Covert to adopt some other course for the trial by the United States of civilians employed with such forces in time of peace. These legislative matters are not for us to determine; we mention these possibilities because they bear upon the reasons for our decision that the present generality of subparagraph (11) is not to be subdivided by the courts so as to include appellant when the provision cannot validly include all who were intended to be covered by its terms as the statute left the hands of Congress. There is a complete absence of any legislative standard for the inclusion of appellant other than a standard that includes all civilian employees with the forces abroad, and that standard is so extensive as to be invalid as a basis for denial to civilians tried by the United States in time of peace of the protection of Article III, § 2 of the Constitution and of the Fifth and Sixth Amendments.[7]

Appellant should be discharged from the custody of appellees.[8]

Reversed and remanded.

BURGER, Circuit Judge (dissenting).

The majority holds invalid a conviction of a civilian employed overseas by the Air Force, under Article 2, Uniform Code of Military Justice, for theft of Government property (valued at over $4000). They do this even though, as I shall try to demonstrate, there is no other feasible means of law enforcement available at a foreign military base for crimes against the United States. While purporting to make a narrow decision, the consequence of the majority holding is to strike down, for all practical purposes, all of the Uniform Code of Military Justice which relates to trial of non-military personnel in peacetime. This holding is reached by two steps (a) the authority of Reid v. Covert[1] and (b) that this court cannot sever the part of the statute relating to "persons * * * accompanying the armed forces outside the United States" from that part of the statute relating to "persons serving with, [or] employed by * * * the armed forces outside the United States." (10 U.S.C. § 802(11), Art. 2 UCMJ)

First, Reid v. Covert does not warrant the conclusion reached by the majority, and second, the statutory intent as well as the explicit language renders "persons serving with, [or] employed by" so readily distinguishable and severable from "persons accompanying" members of the armed forces that no real problem of statutory construction is involved. I therefore see no escape from meeting the constitutional issue and do not think the majority has succeeded in avoiding that issue.

Article I, § 8, cl. 14, of the Constitution empowers Congress "to make Rules for the Government and Regulation of the land and naval Forces." It has been held that this grant empowers Congress

---

7. The principle invoked by appellees that a person may attack as invalid only the attempted invasion of his own rights is not applicable, for the attempted application here is to appellant himself.

8. Since submission of the case we have been advised by the United States Attorney that on June 9, 1958, the United States Court of Military Appeals has denied appellant's petition for a grant of review of his court-martial conviction.

1. 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed. 2d 1148, rehearing and reversing, 1956, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352, and Kinsella v. Krueger, 1956, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342.

to make rules governing this defined class without strict regard for certain constitutional guarantees applicable to citizens generally.[2] The inquiry here is whether Clause 14, properly interpreted in its constitutional context, empowers Congress to provide for military trials in non-capital cases of United States civilians employed overseas by the armed forces in peacetime. The Supreme Court's holding that Congress did not have the power to provide for such court-martial trials of military *dependents* charged with *capital* offenses by implication declared unconstitutional one phrase of Article 2(11) of the Uniform Code of Military Justice, and that phrase only insofar as it relates to capital offenses. United States v. Dial, 9 U.S.C.M.A. 541, 26 C.M.R. 321 (1958).[3] The majority here extends the scope of Reid v. Covert in two directions: first, to civilian employees (as distinguished from dependents), and second, to non-capital cases.

Judicial caution, always appropriate in dealing with such far reaching matters as this, is especially in order where, as here, the joint action of the Legislative and Executive Branches under scrutiny deals with the national defense and delicate matters of foreign policy.[4] The presumptions of constitutionality should not be quickly cast aside merely because a closely connected but legally unrelated portion of the same statute has previously been declared unconstitutional.

Article 2 of the Uniform Code of Military Justice [5] lists various categories of persons who are subject to military jurisdiction. Subsection (11) so classifies "persons serving with, employed by, or accompanying the armed forces outside the United States * * *." Reid v. Covert invalidates by implication only that part applying to "persons accompanying," but my colleagues find it impossible to divide subparagraph (11) so as to sustain the distinction between "persons accompanying" on the one hand and "persons serving with, [or] employed by" on the other. Reid v. Covert itself, the single case on which they rely, furnishes one basis for this distinction.

### I

The opinion of Mr. Justice Black, in which he speaks for four members of the Court (himself, the Chief Justice and Justices Douglas and Brennan), is very carefully limited to "wives, children and other dependents of servicemen." 354 U.S. at page 23, 77 S.Ct. 1222, 1233, 1 L.Ed.2d 1148. It expressly recognizes "that there might be circumstances where a person could be 'in' the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform." 354 U.S. at page 23, 77 S.Ct. at page 1233.

Justice Black's opinion declares that military jurisdiction can never be extended to "civilians," but it scrupulously re-

2. Dynes v. Hoover, 1857, 20 How. 65, 61 U.S. 65, 15 L.Ed. 838; Ex parte Reed, 1879, 100 U.S. 13, 25 L.Ed. 538. Among those constitutional rights which Congress may deny to this defined class are trial by jury and venue requirements (Art. III, § 2, and amend. VI), indictment by grand jury (amend. V).

3. The "persons accompanying" phrase of art. 2(11), UCMJ, 10 U.S.C. § 802(11) (Supp. V, 1958). The United States District Court of West Virginia, subsequent to the above opinion of the Court of Military Appeals, released Mrs. Dial on writ of habeas corpus, declining to distinguish between capital and non-capital cases with respect to the constitutional power of Congress over wives of servicemen. United

States ex rel. Singleton v. Kinsella, D. C.S.D.W.Va., 1958, 164 F.Supp. 707.

4. "These powers ["to raise armies; to build and equip fleets; to prescribe rules for the government of both * * *"] ought to exist without limitation, *because it is impossible to foresee or define the extent and variety of national exigencies, or * * * means which may be necessary to satisfy them.* The circumstances which endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed." The Federalist No. 23, at 145 (Ford ed. 1898) (Hamilton). (Emphasis not added.)

5. 10 U.S.C. § 802 (Supp. V, 1958).

frains from drawing a clear line of the boundary between civilians and persons "in" the armed forces. Although it explicitly rejects the argument that the Necessary and Proper Clause could justify extension of military jurisdiction "to any group of persons beyond that class described in Clause 14" (354 U.S. at pages 20–21, 77 S.Ct. at page 1232), it avoids delineating that class with precision. Indeed, the very language quoted above clearly indicates that the class might well include civilian employees as distinguished from dependents, or at the least, some of them.

Mr. Justice Frankfurter, concurring separately, was unwilling to read Clause 14 in isolation from the Necessary and Proper Clause. Only by reading the two clauses together, he said, may there "be avoided a strangling literalness in construing a document that is not an enumeration of static rules but the living framework of government designed for an undefined future." (354 U.S. at page 43, 77 S.Ct. at page 1244.) Mr. Justice Frankfurter was articulating the same warning we find in the Federalist No. 23 dealing with congressional powers "to raise armies." The test he proposed for determining whether the Constitution permits trial of a given civilian for a given crime is whether that person was "so closely related to what Congress may allowably deem essential for the effective 'Government and Regulation of the land and naval Forces' that [he] may be subjected to court-martial jurisdiction" (354 U.S. at page 44, 77 S.Ct. at page 1244) for his particular offense. Justice Frankfurter's concurrence was accordingly limited to the position that Congress may not in peacetime provide for military trials of *civilian dependents* charged with *capital* offenses without a grand jury indictment and trial by jury. He makes this "narrow delineation of the issue" (354 U.S. at page 45, 77 S.Ct. at page 1245) clear beyond any possible doubt.

Mr. Justice Harlan, in his separate concurrence, also disagreed with Justice Black's dictum that Clause 14 power "was intended to be unmodified by the Necessary and Proper Clause." (354 U.S. at page 67, 77 S.Ct. at page 1257.) He emphasizes the position, also taken by Mr. Justice Frankfurter, that special considerations apply in cases involving capital offenses. He warned that the Court should not unnecessarily foreclose its "future consideration of the board questions involved in maintaining the effectiveness of * * * national [military] outposts" (354 U.S. at page 77, 77 S.Ct. at page 1261) by deciding more than was directly involved in the case before it.

The position of the majority of this court is that when the Supreme Court struck down that part of Article 2(11) relating to capital cases involving "persons * * * accompanying the armed forces," it unavoidably struck down Article 2(11) in its entirety, and thereby destroyed all authority to try by courts-martial persons "serving with, [or] employed by" the armed forces charged with non-capital offenses. Nothing held, or even intimated by the Supreme Court warrants this result, and familiar rules for judicial guidance dictate two courses which would lead to the result I urge: first, this case is readily distinguishable, on its facts, from Reid v. Covert; second, we should not hold non-severable a part of the statute which is in no way dependent on or logically related to that part invalidated by the Supreme Court.

The three opinions in Reid v. Covert indicate that there are two approaches which may be used to distinguish the present case from the one decided there. First, on the approach of Mr. Justice Black, I suggest that appellant may well be "in" the armed forces for the purposes of Clause 14 jurisdiction and that that Clause, considered in isolation, justifies military jurisdiction in this case. Second, on the approach suggested by the concurring opinions, I conclude that military jurisdiction is warranted here even if it be thought that appellant was not within the specific class delimited by Clause 14. These conclusions are plainly consistent with the holding of Reid v.

Covert, unless we ignore the distinctions so carefully drawn there by all the opinions.

Even if the conclusion is ultimately reached that "persons serving with [or] employed by" may not be subjected to military jurisdiction, the reasoning and the route must be different. The problem of constitutional interpretation inescapably presented by this case cannot be side-stepped by citing Reid v. Covert as controlling. It will take a new or different step to reach the conclusion that the Constitution prohibits exercise of military jurisdiction in the case now before us.

## II

In Reid v. Covert the Court considered historical precedent for court-martial jurisdiction over civilians and found that British constitutional history since the Revolution of 1689 and American history strongly compelled the result that was reached.[6] This same historical approach supplies us with one solid criterion for distinguishing the present case from Reid v. Covert. Ever since 1689 military law has been regarded by English speaking people as an unwelcome but necessary abridgment of civil rights. The first British Mutiny Act (1689), after declaring that no man should be punished except by a judgment of his peers, proceeded: "Yet, nevertheless, it being requisite for retaining such Forces * * * in their Duty an exact discipline be observed."[7] Despite the pervading desire evidenced here and elsewhere[8] to place all possible limitations upon the jurisdiction of courts-martial, the British Articles of War in force at the time of our Revolution provided that

"All Suttlers and Retainers to a Camp, and all Persons whatsoever, *serving with* Our Armies in the Field, though no inlisted Soldiers, are to be subject to Orders according to the Rules and Discipline of War." (Emphasis added.)[9]

A substantially identical provision was enacted by the Continental Congress in 1775,[10] was reenacted in 1776,[11] and again included in the first Articles of War enacted after the Constitution, in 1806.[12]

Although there is surely reasonable debate over the meaning of the phrase "in the field" as it is used in these articles, there can be no doubt that all of these statutes make allowance for persons "serving with" the armed forces while remaining silent concerning those "accompanying" the army. This is more than a mere verbal distinction. Although there is some slight authority for holding wives of soldiers subject to court-martial under these provisions,[13] there is definite emphasis on the element of "serving." The fact that two classes of employees—suttlers and retainers—were used surely must be regarded as significant. Whatever disagreement there may be over the precise construction of these articles, it cannot be disputed that, under certain circumstances, military court-martial jurisdiction over civilian employees of the armed forces was standard practice at the time the Constitution was adopted. Provision for such juris-

---

6. Justice Black's opinion, 354 U.S. at pages 23–35, 77 S.Ct. at pages 1233–1240, 1 L.Ed.2d 1148.

7. As reprinted in Winthrop, Military Law and Precedents 929 (2d ed., Reprint 1920) (hereinafter cited as Winthrop).

8. See the various authorities cited by Mr. Justice Black, 354 U.S. at pages 24–28, 77 S.Ct. 1222, 1 L.Ed.2d 1148; see also the report of Parliamentary debates on the British Mutiny Act (1689) set out in 19 Rapin, History of England 188–92 (5th ed. Tindal 1763).

9. British Articles of War of 1765, art. 23 section 14, reprinted in Winthrop 941; the same provision is contained in the British Articles of War of 1774, art. 23, section 14, reprinted in Davis, A Treatise on the Military Law of the United States 593 (3d ed. 1915).

10. 2 J.Cont.Cong. 116 (1775).

11. 5 J.Cont.Cong. 800 (1776), reprinted in Winthrop 967.

12. 2 Stat. 366, reprinted in Winthrop 981.

13. See Winthrop 99 n. 94 and authorities cited there.

diction has been maintained in the statutes in some form ever since.[14]

This power has been repeatedly upheld as constitutional with respect to its exercise during wartime.[15] The central issue here is whether its peacetime exercise is constitutional. Several times it has been held so by various courts under circumstances substantially similar to those in the present case.[16] On the other hand, no case prior to Reid v. Covert has been cited or found upholding military jurisdiction over the wife or other dependent of a serviceman, either in peace or war. Indeed, it was not until 1916 that Congress expanded the class subject to courts-martial by adding thereto "persons accompanying" the armed forces.[17] Even then it was not made clear that this phrase included dependents, and the cases arising under it have involved employees, not dependents.[18] Without doubt military jurisdiction over essential civilian employees at overseas bases would be sustained in wartime. There remains unanswered whether courts can take judicial notice of the fact that what we call peacetime is, except for degree, much like the sporadic, limited, undeclared warfare with savage Indian tribes and bands a hundred years ago.[19] Under the majority holding a civilian employee of the military on duty in Korea in the 1950–54 period, declared only to be an "emergency," would be immune from punishment for stealing military supplies, except as the "civilian government" of South Korea would try him under its criminal code—if any.

### III

The authority for military jurisdiction, with respect both to its wartime and peacetime exercise, rests on Article 1, § 8, cl. 14, read together with the Necessary and Proper Clause.[20] Constitutional authority has thus been found for military jurisdiction over civilian employees of the armed forces who are serving outside the United States. Appellant contends, however, that this jurisdiction can be justified only by the existence of a declared state of war.[21] While such authority must be strictly limited and its exercise scrutinized, it seems to me that circumstances exist other than a state of declared war, which

---

14. Articles of War of 1806, art. 60, 2 Stat. 366, reprinted in Winthrop 981; Articles of War of 1874, art. 63, Rev. Stat. § 1342, p. 236 (1875), reprinted in Winthrop 991; Articles of War of 1916, art. 2(d), 39 Stat. 651; UCMJ, art. 2 (11), 10 U.S.C. § 802(11) (Supp. V, 1958).

15. Perlstein v. United States, 3 Cir., 1945, 151 F.2d 167, certiorari granted, 327 U.S. 777, 66 S.Ct. 956, 90 L.Ed. 1005, dismissed as moot, 1946, 328 U.S. 822, 66 S.Ct. 1358, 90 L. Ed. 1602; Hines v. Mikell, 4 Cir., 259 F. 28, certiorari denied, 1919, 250 U.S. 645, 39 S.Ct. 494, 63 L.Ed. 1187; Grewe v. France, D.C.E.D.Wis.1948, 75 F.Supp. 433; In re Berue, D.C.S.D.Ohio 1944, 54 F.Supp. 252; McCune v. Kilpatrick, D.C.E.D.Va.1943, 53 F.Supp. 80; In re Di Bartolo, D.C.S.D.N.Y.1943, 50 F.Supp. 929; Ex parte Jochen, D.C.S.D.Tex.1919, 257 F. 200; Ex parte Falls, D.C.N.J. 1918, 251 F. 415; Ex parte Gerlach, D.C.S.D.N.Y.1917, 247 F. 616.

16. Matter of Varney, D.C.S.D.Cal.1956, 141 F.Supp. 190; United States v. Wilson, 9 U.S.M.C.A. 60, 25 C.M.R. 322

(1958); United States v. Burney, 6 U.S.C.M.A. 776, 21 C.M.R. 98 (1956).

17. Articles of War of 1916, art. 2(d), 39 Stat. 651.

18. E. g., Perlstein v. United States, 3 Cir., 1945, 151 F.2d 167, certiorari granted 327 U.S. 777, 66 S.Ct. 956, 90 L.Ed. 1005, dismissed as moot, 1946, 328 U.S. 822, 66 S.Ct. 1358, 90 L.Ed. 1602; In re Di Bartolo, D.C.S.D.N.Y.1943, 50 F. Supp. 929. For the legislative history of this addition, see S.Rep. No. 130, 64th Cong., 1st Sess. Pertinent portions are reprinted in In re Di Bartolo, supra 50 F.Supp. at pages 932–933.

19. Cf. U. S. v. Wiese, No. CC 488, National Archives; U. S. v. Trader, No. HH 882, National Archives; U. S. v. Barnard, No. HH 895, National Archives; U. S. v. Ringsmer, No. HH 880, National Archives.

20. See, e. g., Matter of Varney, D.C.S.D. Cal.1956, 141 F.Supp. 190; Ex parte Jochen, D.C.S.D.Tex.1919, 257 F. 200; United States v. Wilson, 9 U.S.C.M.A. 60, 25 C.M.R. 322 (1958).

21. Brief for Appellant, p. 9.

warrant its employment until and unless a workable substitute can be devised.

In the words of The Federalist, "the circumstances which endanger the safety of nations are infinite and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed." [22] The circumstances which today endanger the safety of this and all free nations are utterly different in nature and degree from those which confronted the drafters of the Constitution. The unique perils we face could not be anticipated in the 1780's but the constitutional architects carefully recognized this and left the future reasonably free to deal with its own problems. Among the "unforeseeables" which they prophetically allowed for is the fact that while armies of that day depended chiefly on uniformed soldiers, today in what is technically "peacetime" there are roughly 25,000 civilian employees serving our armed forces at numerous military bases spread throughout the world. That military bases on this scale are maintained by us in peacetime is, in itself, a startling innovation since World War II. Yet the majority holds that Congress may not provide court-martial trial for these essential civilian employees at foreign bases.

This holding at once overlooks the changing world we live in, to which I have already alluded, and forges "constitutional shackles" on the power of Congress and the Executive to deal with present day realities. The "undeclared," "limited" and "cold wars" since 1950 have engaged more men than all the wars in which our country participated from our Revolution to World War I. Moreover it cannot be denied that many of the "persons serving with [or] employed by * * * the armed forces outside the United States" are more essential than the uniformed soldier; that a civilian electronics expert or chemical engineer may be more essential than some generals, where the function of the base is the maintenance of aircraft and readying atomic arms and ICBM's.

The majority opinion attempts to avoid the impact of all these hard and real considerations by relying on Reid v. Covert, but these very facts contribute to distinguishing the two cases. These, I am confident, were the considerations which impelled the Supreme Court there to emphasize the narrow scope of its holding. These, no doubt, were the factors that led Mr. Justice Harlan to inveigh against foreclosing "future consideration of the broad questions involved in maintaining the effectiveness of * * * national outposts." [23] Our present holding, if it stands, could have, and probably will have, a major impact on the effectiveness of our "national outposts" at a time when so-called limited warfare may be imminent in various parts of the world; at such a time, above all, none but the most imperative restraints should be imposed by the courts. However expressed, the issue here is simple: it is the delicate problem of balancing important rights of citizens against the needs of maintaining efficient national security. In the narrow context of a capital offense by a wife of a soldier in Reid v. Covert the Court found the scales tipped in favor of the individual interest. No challenge to that holding is involved in here resolving the balance in favor of broad national interests. I believe further that the holding I suggest for this case should extend to all non-capital cases involving overseas civilian employees of the armed forces. The question should not be left open for further litigation on a case-by-case basis with the result that one employee would be amenable to military jurisdiction by virtue of a possibly more intimate connection with the services than appellant while another would not be. To do so would lead to unnecessary administrative as well as judicial chaos. [24] I do not reach

22. The Federalist No. 23, at 145 (Ford ed. 1898) (Hamilton).

23. 354 U.S. at page 77, 77 S.Ct. at page 1261, 1 L.Ed.2d 1148.

24. See 71 Harv.L.Rev. 140 (1957).

the question of capital cases of those serving with or employed by the military.

## IV

If there were a feasible means, reasonably available for dealing with this problem, Congress should be required to provide procedures for these civilian employees, securing for them indictment by grand jury and trial by jury. But in the absence of a feasible substitute, Clause 14 together with the Necessary and Proper Clause [25] seems to me to empower Congress to subject these employees to trial by court-martial. No such substitute is suggested by the majority and I am unable to find any substitute. Several alternatives come to mind as being possible, but none are practical or desirable. The six alternatives are (see footnotes for objections): (a) induct all employees into the service and place them in uniform regardless of training or pay rates; (b) leave trial for crimes committed abroad entirely in the hands of the foreign sovereign in whose territory the act occurred; (c) bring accused employees back to the United States for trial; (d) set up new Article III courts (either within or without the military establishment) to provide the constitutional procedures for overseas trials of U.S. civilians; (e) provide by employment contracts that these employees subject themselves to court-martial jurisdiction for trial of crimes committed outside the United States; (f) make no attempt to punish these civilian employees for any crimes they might commit overseas, instead merely discharge them.[26]

25. In Reid v. Covert Mr. Justice Black, disagreeing with the majority of the Court, said we must read Art. I, § 8, cl. 14, in isolation, rather than with the Necessary and Proper Clause. Even conceding this, arguendo, the absence of a feasible substitute for overseas court-martial jurisdiction should be an important practical consideration when we undertake judicially to define the limits of the "armed forces." See text at pages 14–15, supra [pages 934, 935 of 259 F. 2d].

26. (a) This would not accomplish the desired result: it would not secure for these persons either trial by jury or indictment by grand jury. Furthermore, it is utterly impractical from the important standpoint of personnel management. Some of the skilled technicians probably command higher wages than ⁹generals; yet their jobs require them to work side-by-side with enlisted and non-commissioned personnel.

(b) Like the first suggestion, this also fails to guarantee the sought-for constitutional rights. In some cases it might result in subjecting United States citizens to bizarre or "cruel and inhuman" punishments. In addition, if the employees were stationed in some barren area, not actually under the control of any government (e. g., Antarctica) this alternative would not be available.

(c) This would tend to deprive the accused of the benefit of friendly witnesses. It would violate the fundamental principle that trial should be held where the crime occurred, a principle fought for in the Revolutionary War. In the Declaration of Independence, one of the grievances listed charged the English with "transporting us beyond Seas to be tried for pretended offenses." See also Blume, The Place of Trial of Criminal Cases, 43 Mich.L.Rev. 59 (1944); Note, Criminal Jurisdiction over Civilians Accompanying American Armed Forces Overseas, 71 Harv.L.Rev. 712, 717–18 (1958).

(d) This would collide with the sovereign rights of the country where the crime was allegedly committed. Under the present "Status of Force" agreements these countries have granted us the limited privilege of exercising court-martial jurisdiction over our armed forces and persons serving with them. These agreements constitute a substantial concession won only after lengthy negotiation, and it is extremely unlikely that many countries would be willing to permit us to encroach further. See Hearings on Status of the North Atlantic Treaty Organization, Armed Forces, and Military Headquarters Before the Senate Committee on Foreign Relations, 83d Cong., 1st Sess. (1953); Note, Criminal Jurisdiction over American Armed Forces Abroad, 70 Harv.L.Rev. 1043 (1957).

(e) There are serious doubts whether such a contract would be valid. Although all of the rights involved here may be waived under certain circumstances, the waiver must be surrounded with certain safeguards. See Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268; Patton

The problem of finding an alternative to courts-martial for the trial of *capital* charges against civilian *dependents* was considered by the Supreme Court in Reid v. Covert.[27] That limited situation does not pose as acute a problem for the administration of discipline in the armed forces as does the absence of any practical jurisdiction over *employees* for *all* charges. As Mr. Justice Frankfurter pointed out,[28] the incidence of capital charges brought overseas against dependents has been so small since the adoption of the Uniform Code of Military Justice that it does not merit great consideration. The two-phase extension of Reid v. Covert adopted here by the majority at once intensifies and enlarges the problem of a substitute jurisdiction. Yet, as I have pointed out, there is no adequate substitute and my colleagues appear to acknowledge this for they do not even attempt to suggest one.

This case does not in any sense present the courts with military usurpation of civilian power. The military tribunals exercise jurisdiction only to the extent and precisely on the terms fixed by Congress and the Executive—both elected representatives of the people. Together the Legislative and Executive branches can, at will, modify, revoke or exercise broad and effective supervisory powers over the manner in which this jurisdiction is used. I emphasize this because it points up the restraint and caution judges, and more especially this court, ought to exercise in setting aside the carefully considered joint action of the two coordinate branches of government exercising power thought by most reasonable men to have existed for over a century and a half.[29] We now strike down such action in reliance on the minority views of the Supreme Court with full awareness that there is no other feasible means of dealing with law enforcement concerning civilians at our foreign bases. Reid v. Covert has been called an invitation to murder, but as Mr. Justice Frankfurter suggested, Americans at overseas bases tend to commit relatively few murders. The majority opinion here is an invitation to larceny and every other one of the vast array of crimes within the reach of human ingenuity. We are left only with a qualified hope that these offenders may be subject to dismissal from "public service" if the offense can be established. I am unable to join in this kind of judicial negativism which strikes down sound, historically supported legal action and leaves a vacuum which cannot be filled.

v. United States, 1930, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854. In Adams v. United States ex rel. McCann, supra, the Court upheld a waiver of trial by jury in the absence of counsel; three justices (Murphy, Black, and Douglas) dissented, and the majority said that "an *accused*, in the exercise of a free and intelligent choice, *and with the considered approval of the court*, may waive trial by jury." 317 U.S. at page 275, 63 S.Ct. at page 240, 87 L.Ed. 268. (Emphasis added.) Here the suggested waiver (by contract) would be made without two of the safeguards the Supreme Court has said are necessary.

(f) Abdication of all legal restraint is unrealistic. It would prejudice the rights and interests of the whole people and of citizens in the overseas community to secure a few rights for a small number; it would tend to break down discipline and would tend to be highly prejudicial to national prestige.

27. See 1956, 352 U.S. 901, 77 S.Ct. 123, 1 L.Ed.2d 92; Justice Frankfurter concurring, 354 U.S. at pages 47–49, 77 S.Ct. 1222, 1 L.Ed.2d 1148; Supplemental Brief on Rehearing for Appellant, pp. 40–63; Supplemental Brief on Rehearing for Appellee, pp. 137–59.

28. 354 U.S. at pages 47–48, 77 S.Ct. 1222.

29. Not controlling, but interesting, is the universal recognition of the UCMJ as the most enlightened military code in history and as affording the basic elements of fairness. This is far from unbridled military power over civilians; it is bridled, harnessed, and hobbled—as it should be—by explicit congressional acts, and subject to the scrutiny of the United States Court of Military Appeals, composed of civilians, and other United States courts via habeas corpus.