Ex parte JOCHEN.

(District Court, S. D. Texas. April 8, 1919.)

D. L. 267

1. ARMY AND NAVY ☞2—MILITARY LAW—MILITARY JURISDICTION.

As distinguished from "military government" and "martial law" proper, military jurisdiction under military law, which is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces, obtains and is to be exercised in time of peace as well as of war.

2. ARMY AND NAVY ☞44(2)—MILITARY LAW—PERSONS SUBJECT.

Whether one is subject to military jurisdiction under military law depends on whether he is a member of the land or naval forces and Congress has subjected him to such law.

3. JURY ☞11(4)—PERSONS SUBJECT TO MILITARY LAW.

If one is a member of the land or naval forces, Congress can subject him to military law, and the guaranties of the Constitution for trial by jury are inapplicable.

4. ARMY AND NAVY ☞44(2)—LAND FORCES—ABSENCE OF UNIFORM.

That one may be a part of the land forces, and so may be subjected to military law, it is not necessary that he be in uniform.

5. ARMY AND NAVY ☞44(2)—ARTICLES OF WAR—"ATTENDANT OR PERSON ACCOMPANYING OR SERVING WITH THE ARMIES."

One serving with troops as superintendent quartermaster corps is an "attendant or a person accompanying or serving with the armies," within Articles of War, art. 2, as adopted August 29, 1916, subjecting such persons under certain conditions to such articles.

6. ARMY AND NAVY ☞44(2)—ARTICLES OF WAR—"IN THE FIELD."

The term "in the field," in Articles of War, art. 2, as adopted August 29, 1916, subjecting to such articles all retainers and persons accompanying or serving with the armies in the field, will be construed as used with the meaning which long usage of the War Department had given them, and as contained in its General Orders, Compilation 1881 to 1915, § 319, also Manual Quartermaster's Corps, United States Army, § 2193, defining "field service" to be service in mobilization, concentration, instruction, or maneuver camps, as well as service in campaign, simulated campaign, or on the march.

[Ed. Note.—For other definitions, see Words and Phrases, In the Field.]

7. ARMY AND NAVY ☞44(2)—ARTICLES OF WAR—"IN THE FIELD."

Were the words "in the field," in Articles of War, art. 2, as adopted August 29, 1916, subjecting to such articles all retainers and persons accompanying or serving with the armies in the field, used in their limited sense, and applicable only where the armies are in or expecting actual conflict, the conditions along the Mexican border from February, 1917, to December, 1918, were such as to make them applicable.

Habeas Corpus. Application by Edward E. Jochen for writ of habeas corpus to secure release from military custody. Application dismissed.

Upon application for writ of habeas corpus by Edward E. Jochen, it appearing therefrom that applicant is in custody at Brownsville, Tex., more than 300 miles from Houston, where the court is sitting, a rule was issued requiring the respondent, Col. Frank Keller, to show cause February 28, 1919, at Houston, Tex., why writ of habeas corpus should not issue. To this rule respondent made return, justifying the detention of applicant upon the following state of facts:

That the defendant, as commanding officer of United States troops at Brownsville, Tex., has the applicant in confinement. That applicant from February 12, 1917, to December 24, 1918, served with the United States troops in the territory embraced in the Brownsville district, namely, from the mouth of the Rio Grande river to Arroyo Del Tigre, as superintendent quartermaster corps, during all of which time applicant was under the direct orders of the commander of the Brownsville district. That on, to wit, December 23, 1918, he was charged with having, during the time of his service from September 1, 1917, to December 15, 1918, committed crimes and offenses in violation of the Articles of War (Comp. St. § 2308a), and was taken into custody by the authority of respondent. That these charges were duly referred for trial to the General Court-Martial, duly appointed to sit at Brownsville. That the applicant was duly arraigned and tried by said court, and is now held in confinement awaiting the review of the said proceedings, and that in all matters relating to the arrest, confinement, and trial of the applicant the rules regulating military procedure have been complied with. That the military jurisdiction over applicant as to arrest, detention, and trial is asserted upon the ground that applicant is a person subject to military law, being as claimed by respondent, though a civilian, a person coming within the scope and meaning of subdivision D of the Second Article of War, which provides as follows:

"All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war, all retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

That during the period in which the applicant is charged to have committed the crimes and offenses, the United States was at war, and that during all of said time the armies of the United States with which the applicant was serving, to wit, troops in the Brownsville district, were in the field. That the general orders of the War Department, section 319, Compilation 1881 to 1915, also section 2193, Manual Quartermaster's Corps, United States Army, provides as follows:

"Field service is defined to be service in mobilization, concentration, instruction or maneuver camps, as well as service in campaign, simulated campaign, or on the march."

That the duty of the troops in the Brownsville district is to patrol the Texas-Mexican border, for the preservation of life and property in the district, and to enforce the laws of the United States. That, in the performance of said duty, outposts at frequent intervals are maintained at or near the Rio Grande river. That, as supports and reserves for said outposts, squadron stations are maintained at Brownsville, San Benito, Mercedes, McAllen, Sam Fordyce, and Ft. Ringgold. That they are all equipped for field service, wear the field uniform, are supplied under conditions for troops in the field, are housed in the outposts in tents or huts, and at the squadron stations—with few exceptions—in barracks of the cantonment type, and the troops are designated as troops in the field. That the commander of said district had at all times had authority in certain contingencies to cross the river into Mexico, and troops had been prepared to make such crossings at an instant's notice. That all administrative orders relating to said troops are given to them as troops in the field. That since 1915 there has been considerable unrest on the border. What were known as bandit raids frequently occurred, and numerous fights took place between bandits, soldiers, and civilian officers, extending to the wrecking of a passenger train and the killing and wounding of several persons. That during 1916, and up to the present, there had been about five distinct invasions of Mexico by our troops following bandits therein. That the soldiers have been greatly needed on the border to protect life and property, and that they are at all times maintained and equipped for combat with bandits and law violators in the border section.

Attached to the return among other affidavits are affidavits of Col. Hamilton Bowie, commanding United States troops at Ft. Ringgold, Tex., and of

Col. Herbert J. Slocum, commander of the Brownsville district troops from January, 1918, to October, 1918. They establish that, during the time the latter was in command of the district, one officer was killed in Mexico, and about ten enlisted men were killed by fire from Mexico; that at many times it was unsafe to water the horses in the river; that in the military sense the troops were ready and looking for a fight at any minute; their duties were the same as if opposing a foe, and the troops were frequently on the firing line; that the war with Germany made it necessary for these troops to be in the field along the Southern Texas border for protection against German influences in Mexico, which at times assumed a serious and dangerous aspect, requiring our troops to be on constant patrol duty in the field, at all times fully armed and equipped. By his affidavit, Col. Bowie establishes that the troops under his command at Ft. Ringgold were on "field duty" as defined in the army regulations, as distinguished from garrison duty; that, of the four troops of cavalry under his command, one was constantly on outpost duty on the international border at distances of from 13 to 25 miles from Ringgold, and that frequent patrols were made along the border, and guards were at all times maintained; that these troops were equipped for field service with pack trains at all times ready, together with a wireless station for communications; and that an intelligence department was maintained and civil scouts employed to procure and report information of military value. At the time the troops stationed at Ft. Ringgold, and detached from that station, they were occupied with guard duty, patrols, target practice, and care of animals, incident to field service, to the exclusion of ceremonies and drills of precision, which are features of garrison service. All matters of fact thus stated in support of the return, I find to be true.

It further appears from the application and the return that, on some of the offenses with which Jochen is held to the military court, he is also charged in this court in the Brownsville division, and has been bound over by the commissioner to the grand jury. It appears with reference to this feature of the case, as shown in the supporting affidavits, that the arrest by the civil court was made on information from the military authorities, and after the military authorities had taken the applicant into actual or constructive custody, and it is apparent that, in so far as the question of comity arises between the military and the civil tribunal, as to many of the matters with which he is charged by the court-martial, no jurisdiction has ever attached in the civil court, and that as to those of which the civil court has jurisdiction the same was acquired under such circumstances as that, if comity alone operated to dispose of this' matter, it would require that applicant not be taken from the military control in which he now is.

James A. Graham, of Brownsville, Tex., for applicant.

Major William C. Bedal, Judge Advocate, for respondent Col. Frank Keller.

HUTCHESON, District Judge (after stating the facts as above). [1] In every inquiry by the courts into the assertion and exercise of military jurisdiction, the question which arises at the threshold, and must be first determined, is: What kind of jurisdiction does the military seek to assert? As to this question, there has not, since the great case of Ex parte Milligan, 4 Wall. 141, 18 L. Ed. 281, been any difficulty in arriving at the fundamental principles which determine it, but only in applying those principles to the particular states of fact. In that case the court said:

"There are under the Constitution three kinds of military jurisdiction: One to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of the United States, or in time of rebellion and civil war within the states or districts occupied by rebels treated as belligerents; and a third to be exercised in time of invasion or insurrec-

tion within the limits of the United States, or during rebellion within the limits of states maintaining adhesion to the national government, when the public danger requires its exercise. The first of these may be called jurisdiction under 'military law,' and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as 'military government,' superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated 'martial law proper,' and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights."

[2, 3] In the case at bar, the jurisdiction asserted by the military is under the first subdivision, "military law," and is bottomed on the acts of Congress "prescribing rules and articles of war or otherwise providing for the government of the national forces." It is therefore wholly beside the mark to discuss, consider, or give weight to the question of whether civil courts were properly functioning, or whether those extreme conditions which alone justify the exercise of military jurisdiction under those branches known as "military government" and "martial law" proper have operation. I would be the last to view with equanimity, or permit without relief, any usurpation or deprivation of civil rights by the military; but where the military, as in this case, seeks only to assert the jurisdiction under military law as represented in the acts of Congress over persons who are claimed to be a part of the national military establishment, the duty of this court is the simple one of determining whether the applicant is a member of the land or naval forces of the United States, and, if so, whether Congress has subjected him to military law, because, while it is clear that under the guaranties of the Constitution no person can be deprived of his right of trial by jury except he be a member of the land or naval forces of the United States or of the militia when in actual service, it is as equally true that if he is a member of the land and naval forces Congress has the plenary power to subject him to military law, and the guaranties of the Constitution for trial by jury are wholly inapplicable.

Of such weight, however, with Congress, has the right of trial by jury always been, that it has never left to implication or construction the question of whether a person is subject to military law, and, in each case where military jurisdiction of that kind is asserted, it is incumbent upon the military to put their finger on the act which confers the jurisdiction.

As far back as 1819, Hon. William Wirt, then Attorney General of the United States, in an able and exhaustive opinion to the Secretary of War, on the question of whether cadets at West Point are subject to military law, in discussing this phase of the question said (1 Op. Attys. Gen. 276):

"Congress has no power to pass a law which shall deprive the person accused of a criminal or otherwise infamous offense, of his trial by jury, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger.

"Even in relation to the land and naval forces (including the militia when

in actual service), Congress have never considered the mere act of stamping on those bodies a military character, by ordering them to be raised, organized, and called into service, as being sufficient, of itself, to subject them to trial by court martial under the rules and articles of war; because this would be to abrogate a high constitutional privilege by implication. In every instance, therefore, in which Congress has impressed a military character on any body of men, whom they intended to divest of the civil right of a trial by jury, besides the impressment of that military character, they have uniformly and expressly declared that they should be subject to the rules and articles of war."

And in the learned and exhaustive way characteristic of that great and able lawyer, he collates and presents the many acts of Congress touching upon such matters from the first resolve of the Continental Congress, passed April 12, 1785, to the act of April 24, 1816, then lately passed.

An investigation of the subsequent enactments of Congress having to do with similar matters will show, in the language of Mr. Wirt, "a course of legislation so long continued and so uniform marking the sacred respect in which Congress have ever regarded the right of trial by jury, that it will justify us in assuming it as their sense, that this right is never to be taken away by implication, never by the mere impressment of the military character on a body, never without a positive provision to that effect." So that, in approaching an investigation of whether the act relied upon as subjecting a civilian attached to the army to military law was within the power of Congress, impressed as I am with the evidences of the caution and respect in which Congress, the co-ordinate branch of this government, has ever regarded jury trials, I would not be justified, except in the clearest case, in declaring an act unconstitutional which is passed by Congress in the exercise of their acknowledged authority to confer military jurisdiction over persons in the land and naval forces of the United States.

[4] That it is not necessary that a person be in uniform in order to be a part of the land forces, I think clear, not only upon considerations of common sense and common judgment, but upon well-considered and adjudicated authority. Some of the leading cases sustaining the jurisdiction of military courts over civilians attached to the army and navy are In re Thomas, Fed. Cas. No. 13,888, 23 Fed. Cas. 931; United States v. Bogart, Fed. Cas. No. 14,616; In re Reed, Fed. Cas. No. 11,636, 20 Fed. Cas. 409; Bogart's Case, Fed. Cas. No. 1,596, 3 Fed. Cas. 796; Dynes v. Hoover, 20 How. 65, 15 L. Ed. 838; Ex parte Milligan, 4 Wall. 123, 18 L. Ed. 281. Against these authorities I find no contrary expression. The apparently contrary view expressed by Attorney General Charles Devens, in 16 Op. Attys. Gen. 13, that a quartermaster's clerk, a civilian employed in that capacity, is amenable to the rules and articles of war, shows that his opinion turned, not upon the want of power of Congress, but upon its failure to subject him to military law; because in that opinion the Attorney General declares that had the clerk been serving with the armies in the field he would, under the sixty-third Article of War, become for the time amenable to court-martial jurisdiction, citing Benet Military Law, p. 29, nor is there any violence done to the dictates of humanity and reason when a person who has become voluntarily a member of the military estab-

lishment has martial law invoked against him; the maxim volenti non fit injuria at once arises, or as it was otherwise stated by Attorney General George H. Williams, in 14 Op. Attys. Gen. 22:

"Persons who attach themselves to an army going up on an expedition against hostile Indians may be understood as agreeing that they will submit themselves for the time being to military control."

[5, 6] It being established then that Congress has the power to subject a civilian to military law under such terms and conditions as it might see fit to impose, it remains only to determine whether the conditions surrounding Jochen's service with the army were those defined in subdivision D, article 2, as a condition of subjection to military law. There is no question but that Jochen was either a retainer to the camp or a person accompanying or serving with the armies of the United States; there is equally no question but that his service was in time of war. On the other hand, he was not serving without the territorial jurisdiction of the United States, and it is vigorously denied that the armies with which he was serving within the United States were "in the field" within the meaning and intent of the act.

Whether, then, the armies with which Jochen was serving were "in the field" is the storm center of this case. Counsel for applicant contends that the words "in the field" are there used in the sense and meaning of the area of actual conflict with an enemy with whom the United States is at war, or, at least, if not within the area of the actual conflict, that the troops must sustain such a relation to the combatant troops in the actual field of battle, as that constructively they are part and parcel of the field operations, and in support of this contention cites the definitions of lexicographers, and the opinion of Judge Hand in Ex parte Gerlach (D. C.) 247 Fed. 616; of Judge Davis in Ex parte Falls (D. C.) 251 Fed. 415; and of Judge Smith in Ex parte Mikell (D. C.) 253 Fed. 817. Counsel for the army, on the other hand, contends that the words "in the field," as used by Congress, have the meaning not only of the territory or zone of actual battle operations against an enemy with whom a declared state of war exists, but that it embraces troops engaged in maneuvers, expeditions, or disposition of any nature designed to perform actual service, either by way of scouting or procuring information, or by way of patrol duties in guarding and protecting the border and the citizens from bandit and other forays, and especially that Congress, in enacting this article in 1916, used the terms "in the field" in the sense in which those terms were defined in the general orders of the War Department, set out in this opinion supra.

It is admitted that the War Department in its practical construction, and in the opinions of the department of the Judge Advocate General, gives the construction to the terms of the act now contended for by the army; but applicant asserts that this construction is purely an administrative one, and that this court must determine the meaning of the words themselves uninfluenced by the construction placed upon them by the Executive Department.

Of course, from a general point of view, this contention is sound, as the judicial branch of the government has no right to delegate its duties

to or receive its instructions from the Executive Department; but there is a difference between the construction given by the Executive Department though mere executive orders which would have no weight whatever with the court, and the construction contained in the quasi judicial opinions of the Judge Advocate General, which, though not binding, would certainly be persuasive in their reasoning with the courts; and it is further a familiar principle of general application that, in considering a statute, technical words relating to an art, a science, or a trade, are ordinarily to be taken in their technical sense, and will be so construed unless the context or other consideration plainly shows a contrary intent (2d Lewis, Sutherland, Statutory Construction, pars. 393-395; 36 Cyc. 1118), and it addresses itself to the reason that, when Congress used a military term in articles of war intended for the government of the military, it used that term in the recognized sense then and for many years given it by that Executive Department, for whose use and employment the article was passed.

In addition to the opinions of the Judge Advocate General, which as aforesaid clearly and with unanimity declare troops in the situation of those to which petitioner was attached to be "in the field," the books contain an opinion written by George H. Williams, Attorney General of the United States, on April 1, 1872 (14 Op. Attys. Gen. 22), in which, as the head of the law enforcement branch of the Executive, he advised the Secretary of War that—

"Civil employés of the War Department, serving with the military forces of the United States in the Indian country" under circumstances showing that "defensive earthworks are deemed necessary and have been built" by troops, where within twelve months soldiers had been attacked and killed by hostile Indians, "and where Indians are believed at all times to be in a semi-hostile attitude," amenable to military jurisdiction and controlled by court martial as persons serving with the armies of the United States "in the field."

This opinion was based on the sixtieth Article of War, providing as follows:

"All sutlers and retainers to the camp, and all persons whatsoever, serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders, according to the rules and discipline of war."

The Attorney General said.

"To determine when an army is 'in the field' is to decide the question raised. These words imply military operations with a view to an enemy. Hostilities with Indians seem to be as much within their meaning as any other kind of warfare."

The only court opinions construing the words "in the field" are, I believe, the three opinions of the district judges above referred to. In the first, Ex parte Gerlach, an application for habeas corpus brought by Gerlach, mate of the steamship El Oxidente, was dismissed; it appearing that the ship was engaged in army transport, and Judge Augustus Hand saying:

"The words 'in the field' do not refer to land only, but to any place, whether on land or water, apart from permanent cantonments or fortifications, where military operations are being conducted."

In Ex parte Falls, it appeared that Falls was assigned as chief cook on the Edward Luckenbach, engaged in transporting supplies for the United States Army. He attempted to desert and was held to court-martial. Judge Davis held that a person serving in the United States Army Transport Service, transporting arms, equipment, and supplies, in time of war, was a person serving with the armies of the United States in the field. In Ex parte Mikell, the applicant was first a stenographer, later field auditor attached to the construction quartermaster of the camp at Camp Jackson, Columbia, S. C., a cantonment, mobilization, and training camp. Judge Smith held that the words "in the field," as used in the second Article of War, mean "in the actual field of operations against the enemy; not necessarily the immediate battle front, nor necessarily the immediate field of battle, but the field of operations, so to say; the field of war; the territory so closely connected with the absolute struggle with the enemy that it is a part of the field of contest"—and, while conceding that under the construction of the War Department the troops at that point would be "in the field," refused to follow the construction placed upon the words by that department.

From the opinion in the case it appears that the construction given by the War Department was not presented as a construction in use prior to and therefore incorporated by Congress into the words of the act, but a subsequent construction grafted on the words of the act by executive decision, and in that view, of course, the remarks of the judge were eminently correct. It appears further from the opinion that Judge Smith was greatly impressed with the idea that military jurisdiction should not be asserted because of the fact that the courts of the country were open for the administration of public justice, and no occasion for the exercise of military existed. He said:

"In the present case, military law has not been proclaimed, all the courts of the country are open, the field of actual war is thousands of miles removed from this district, and peace prevails wholly within the territorial jurisdiction of the United States. There is military preparation there, but no military conflict."

In my view these expressions were not pertinent to the decision of the point, because the only branch of military jurisdiction sought to be exercised by the army in the Mikell Case, as in this, was the first branch, "military law," to be exercised both in peace and war, and resting entirely within the discretion of Congress to be exercised in the manner and over the subjects selected by Congress. Whether or not, therefore, civil courts are functioning, has no bearing, because Congress has the undoubted right to pass laws making persons, members of the land forces, subject to military law even in permanent camps and under strictly peace conditions of absolute normality.

That Congress, in approving and passing the act of 1916, had in view the well-defined and settled use of that term in military parlance and practice, and that it used it in that meaning, I have no doubt. It must be borne in mind that when Congress drafted this act in August, 1916, while the United States was not at war, it was on the very threshold of it, its peaceful ships had been sunk at sea, its nationals had

been sent to violent deaths, on the international border the ordinary racial antipathy of the lawless and ignorant Mexican to the Gringo, which had been through their own civil wars and state of banditry fanned into a smouldering and almost leaping flame, was being fomented by German spies and German propoganda, and border conditions were so acute that mobilization of the militia of the country became necessary. With these conditions of actual war staring Congress in the face, with the country ringing from end to end with demands for preparedness, with the spectacle before its eyes of the most tremendous struggle and the most extraordinary acts of preparation on the part of the combatant nations, the Congress having in mind that, should this country enter the great war, it would need, as experience in Europe showed, an immense army to which must be attached thousands of quasi civilians, and that to produce such an army the United States would necessarily be turned into a vast maneuver field with concentration, mobilization, and training camps and quarters scattered broadcast, having in mind the great maxim, "Salus populi suprema lex," passed the act so as to give to this great army the jurisdiction in time of war to adequately and properly function, not only with reference to the enlisted men, but to all those attached to it for other purposes. The history of the times, as embodied in legislation even affecting civilians, shows that extreme conditions demanded extreme measures. I need only refer to the Espionage Act, the acts against exportation, the act protecting the life of the President, the act authorizing the taking over of the railroads and the wire systems; all of these acts of Congress passed in times of emergency, and designed to compel the individual to subordinate himself, temporarily at least, to things and activities of war conditions, shows the temper, the spirit, and the point of view of Congress so clearly and furnishes such an index to its composite mind, that it can with confidence be asserted that, when it used the words "in the field," it clearly intended them to have the meaning which long usage of the War Department had given to them. If more were needed to sustain this view, comparison of the act in question with the act which it superseded would furnish it.

Prior to the adoption of the present articles, on August 29, 1916, the Article of War more nearly corresponding to paragraph D, second Article of War, was the sixty-third article, reading as follows:

"All retainers to the camp and all persons serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders according to the rules and discipline of war."

The present article subjects to military law all persons attached to the armies of the United States without its territorial jurisdiction, irrespective of the character of the service performed by the armies or of the fact of the existence of war, and subjects all persons within the United States in time of war provided they were serving with the armies in the field.

[7] It is my view, therefore, that the writ should be denied:

First, because I hold that the terms "in the field" were used by Congress in the meaning and sense given to them in the general orders of the War Department, as follows:

"Field service is defined to be service in mobilization, concentration, instruction or maneuver camps as well as service in campaign, simulated campaign or on the march."

And, second, that if in this I am mistaken, and the words are not broad enough to embrace armies in concentration, maneuver, and mobilization camps, but must have application only where the armies are in or expecting actual conflict, that the conditions on the border during the period of Jochen's service were such as that, in the more limited sense as well, the armies with which he was serving were "in the field."

So believing, I hold that Jochen should remain in the custody of and be tried by the military authorities, that the return to the rule should be held sufficient, and the application for the writ of habeas corpus should be dismissed; and it is so ordered.