In the Matter of William K. YOKOYAMA, for Writ of Habeas Corpus.

No. 81–59.

United States District Court
S. D. California,
Central Division.

Jan. 28, 1959.

468

Norbert Baumgarten, Lompoc, Cal., for petitioner.

Laughlin E. Waters, U. S. Atty., Richard A. Lavine, Jordan A. Dreifus, Asst. U. S. Attys., Los Angeles, Cal., for respondent.

YANKWICH, Chief Judge.

The facts in the case are simple. The petitioner is held at the Lompoc Barracks, Santa Barbara County, California, within the jurisdiction of this court, under the judgment of conviction and sentence imposed on July 26, 1958 by a court-martial, convened at Camp Zana, Honshu, Japan. At the time, he was a civilian employee of the Armed Forces of the United States. He was charged with appropriating eight military payment certificates of the value of $50 each, was found guilty and ordered committed for four years and to pay a fine of $3,000. The sentence was later reduced by the reviewing authorities to two years and $3,000.

■ The proceedings in the military court have not become final. But I am of the view that, when a prisoner convicted by court-martial attacks the military tribunal's jurisdiction, not only over the crime, *but over him,* no question can be raised as to whether he has exhausted his remedies through military channels. This, for the reason that he challenges the very basis of the court's jurisdiction. And jurisdiction is the power to hear and determine. It is formed from two Latin words—*juris* and *dictio*—meaning to pronounce the law.

There is a phrase in an old California case which very effectively states that a

judgment rendered by a court without jurisdiction is

"a dead limb upon the judicial tree, which should be lopped off if the power so to do exists."[1]

And so the problem here is whether the court which convicted the petitioner had jurisdiction over him.

## I

### Jurisdiction

The petitioner's contention that no such jurisdiction exists is grounded chiefly upon an opinion of the United States Court of Appeals for the District of Columbia.[2] Much as I respect the members of that court, I am forced to disagree with the conclusion reached by the majority, a conclusion which the Court of Appeals for the Third Circuit[3] and some District Judges[4] have since declined to follow:

■ Before stating my grounds, I advert to the fact that the recent trend of the decisions of the Supreme Court of the United States is to limit strictly the power of the military in time of peace.[5] A decision rendered on January 12, 1959,[6] is illustrative. In this, the Court follows an approach traceable to English tradition which was distrustful of the military except within their strict domain. While the case just referred to does not help solve the problem before us, it exemplifies the strictness with which the power of the military will be interpreted. The case involved a soldier who, while in France, was convicted by a court-martial, discharged dishonorably and sentenced to prison for twenty years. He was serving a sentence in the Army Disciplinary Barracks at Camp Cook, California, when he was convicted by court-martial of the crime of conspiracy to commit murder. The offense occurred on June 10, 1949. He was prosecuted under the provisions of Article of War 92, which provided that no person should be tried by court-martial for murder or rape

"committed within the geographical limits of the States of the Union and the District of Columbia in time of peace." [7]

And the Court held that the soldier, while in prison in military barracks, could not, in peace time, be prosecuted by court-martial for conspiracy to murder. Mr. Justice Douglas [79 S.Ct. 281], in writing the opinion for the majority of the Court, stated that "we were at peace" at the time of the commission of the offense, although no treaty of peace had been entered into. Giving a broad interpretation of the term "peace-time", he disregards the fact that the President's proclamation declaring a state of peace was not issued until a later date. He concludes that to all intents and purposes, we were at peace since "the shooting war" had terminated:

"Whatever may have been the plan of a later Congress in continuing some controls long after hostilities ceased, we cannot readily assume that the earlier Congress used 'in time of peace' in Article 92 to deny soldiers or civilians the benefit of jury trials in capital offenses four years after all hostilities had ceased. To hold otherwise would be to make substantial rights turn on a fiction. We will not presume that Congress used the words 'in time of peace' in that sense. The meaning attributed to them is at war with common sense, destructive of civil rights,

1. People v. Greene, 1887, 74 Cal. 400, 405, 16 P. 197, 199. See the writer's opinion in Arenas v. United States, D.C. Cal.1951, 95 F.Supp. 962, 970, and cases cited in note 22 thereof.

2. United States ex rel. Guagliardo v. McElroy, D.C.Cir.1958, 259 F.2d 927.

3. Grisham v. Taylor, 3 Cir., 1958, 261 F. 2d 204.

4. United States ex rel. Wilson v. Bohlander, D.C.Colo.1958, 167 F.Supp. 791, 797.

5. United States ex rel. Toth v. Quarles, 1955, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8.

6. Lee v. Madigan, 79 S.Ct. 276.

7. 10 U.S.C., 1946, Supp. IV, § 1564, Article of War 92.

and unnecessary for realization of the balanced scheme promulgated by Articles of War. We hold that June 10, 1949, was 'in time of peace' as those words were used in Article 92." [8]

Mr. Justice Harlan and Mr. Justice Clark dissented. Mr. Justice Harlan's dissent is very interesting for it shows the interpretation that he places upon Reid v. Covert,[9] to be discussed further on in the opinion:

"The Court does not reach petitioner's contention that he could not constitutionally be tried by court-martial because he was not a member of the armed forces at the time this offense was committed. It is sufficient to say that this contention is also squarely foreclosed by Kahn v. Anderson, supra [255 U.S. 1, 41 S.Ct. 224, 65 L.Ed. 469], and that in my opinion nothing in United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8, or in Reid v. Covert, 354 U.S. 1, 77 S. Ct. 1222, 1 L.Ed.2d 1148, impairs the authority of Kahn on this score."[10]

II

The Problem before Us

We come now to the main problem confronting us, which is whether the provision of the law contained in the Uniform Code of Military Justice subjecting civilians to the authority of courts-martial for non-military offenses is valid. It reads:

"§ 552. Persons subject to this chapter (article 2)

"The following persons are subject to this chapter: * * *

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands." [11]

The trial of civilians serving with the Armed Forces for non-military offenses is a practice which antedates the American Revolution. The British Articles of War adopted in 1765 placed civilians connected with the army under military discipline.[12]

The American Revolutionary Army had a similar provision in the Articles of War adopted by the Continental Congress on June 30, 1775, which read:

"All officers, conductors, gunners, matrosses, drivers or any other persons whatsoever, receiving pay or hire, in the service of the continental artillery, shall be governed by the aforesaid rules and articles, and shall be subject to be tried by courts-martial, in like manner with the officers and soldiers of the Continental troops." [13]

The Articles of War enacted by the Congress after the Constitution was adopted, beginning with the enactment of April 10, 1806,[14] and ending with the adoption of the present Uniform Code of Military Justice [15] contained similar provisions.

8. Lee v. Madigan, supra, note 6.

9. Reid v. Covert, 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148.

10. Lee v. Madigan, 79 S.Ct. 284 dissenting opinion.

11. 50 U.S.C. § 552(11), now 10 U.S.C. § 802(11).

12. Winthrop, Military Law and Precedents, 2 Ed., 1920, pp. 941–950.

13. Winthrop, op. cit., p. 957; Journal of Continental Congress, Vol. II, 1775, p. 116.

14. 2 Stat. 359.

15. 64 Stat. 109, 50 U.S.C. § 551 et seq., now 10 U.S.C. § 801 et seq. For an examination of the new concepts introduced by this Code of Military Justice, see the writer's opinion in United States v. Shibley, D.C.Cal.1953, 112 F.

In Reid v. Covert,[16] the Supreme Court was confronted with the problem whether a wife charged with the murder of her husband, and who *was not* an employee of the United States, but *merely accompanied* her husband, could be prosecuted for a capital offense by court-martial. Four of the justices held that she could not. Two other justices concurred in the decision on special grounds, to which reference will be made further on in the discussion.

To my mind, the case decides only one matter, i. e., if we apply the words "accompanying the armed forces" to a wife so as to make her subject to military law, when she is charged with a capital offense, we are doing violence to her constitutional rights. The argument that the section insofar as it applies to civilian employees must also fall as lacking substance.[17]

█ If a statute covers several categories, and the application to one category is found to be unconstitutional, the validity of the other categories, *which are distinct and have a valid basis for separate classification,* is not affected.[18]

Mr. Justice Black's opinion makes it plain that in *matters other than capital* or in the case of a civilian employee, the same ruling would not necessarily apply. The following quotations from the opinion indicate this clearly:

"The mere fact that these women had gone overseas with their husbands should not reduce the protection the Constitution gives them.

"The Milligan [Ex parte Milligan, 4 Wall. 2, 18 L.Ed. 281], Duncan [Duncan v. Kahanamoku, 327 U. S. 304, 66 S.Ct. 606, 90 L.Ed. 688] and Toth cases recognized and manifested the deeply rooted and ancient

opposition in this country to the extension of military control over civilians. In each instance an effort to expand the jurisdiction of military courts to civilians was repulsed.

"There have been a number of decisions in the lower federal courts which have upheld military trial of civilians performing services for the armed forces 'in the field' during *time of war.* *To the extent that these cases can be justified, insofar as they involved trial of persons who were not 'members' of the armed forces, they must rest on the Government's 'war powers.'* (Emphasis added.) In the face of an actively hostile enemy, military commanders necessarily have broad power over persons on the battlefront. *From a time prior to the adoption of the Constitution the extraordinary circumstances present in an area of actual fighting have been considered sufficient to permit punishment of some civilians in that area by military courts under military rules.* But neither Japan nor Great Britain could properly be said to be an area where active hostilities were under way at the time Mrs. Smith and Mrs. Covert committed their offenses or at the time they were tried.

"* * * Military trial of civilians 'in the field' is an extraordinary jurisdiction and it should not be expanded at the expense of the Bill of Rights. We agree with Colonel Winthrop, an expert on military jurisdiction, who declared: *'a statute cannot be framed by which a civilian can lawfully be made ame-*

---

, Supp. 734, 742–744, and cases cited in notes 15–17.

16. Reid v. Covert, supra, note 9.

17. See, Grisham v. Taylor, supra, note 3, 261 F.2d at page 204.

18. See, Dorchy v. State of Kansas, 1924, 264 U.S. 286, 288–290, 44 S.Ct. 323, 68 L.Ed. 686; Lynch v. United States, 1934,

292 U.S. 571, 586–587, 54 S.Ct. 840, 78 L.Ed. 1434; United States v. Harriss, 1954, 347 U.S. 612, 627, 74 S.Ct. 808, 98 L.Ed. 989. This principle is observed rigorously when the statute has a severability clause, *as this statute has.* See, Grisham v. Taylor, supra, note 3, 261 F.2d at pages 205–206.

*nable to the military jurisdiction in time of peace.'* (Emphasis not supplied.)" [19] (Emphasis added.)

Mr. Justice Frankfurter, in his concurring opinion, states definitely that he *does not understand the majority* opinion to hold that a civilian *could not be* prosecuted—that only the trial of *civilian dependents in a capital case in time of peace is in question,* and that a wife, charged with murder, who is not a civilian employee, who may accompany her husband and receive such benefits as his wife, *could not be tried by a military tribunal:*

"In making this adjudication, I must emphasize that it is only the trial of civilian dependents in a capital case in time of peace that is in question. The Court has not before it, and therefore I need not intimate any opinion on, situations involving civilians, in the sense of persons not having a military status, other than dependents. Nor do we have before us a case involving a non-capital crime. This narrow delineation of the issue is merely to respect the important restrictions binding on the Court when passing on the constitutionality of an Act of Congress." [20]

Mr. Justice Harlan, in his concurring opinion, similarly limits the scope of the decision. To quote this portion of his opinion:

"Again, I need not go into details, beyond stating that except for capital offenses, such as we have here, to which, in my opinion, special considerations apply, I am by no means ready to say that Congress' power to provide for trial by court-martial of civilian dependents overseas is limited by Article III and the Fifth and Sixth Amendments. Where, if at all, the dividing line should be drawn among cases not capital, need

not now be decided. We are confronted here with capital offenses alone; and it seems to me particularly unwise now to decide more than we have to. Our far-flung foreign military establishments are a new phenomenon in our national life, and I think it would be unfortunate were we unnecessarily to foreclose, as my four brothers would do, our future consideration of the broad questions involved in maintaining the effectiveness of these national outposts, in the light of continuing experience with these problems.

"So far as capital cases are concerned, I think they stand on quite a different footing than other offenses. In such cases the law is especially sensitive to demands for that procedural fairness which inheres in a civilian trial where the judge and trier of fact are not responsive to the command of the convening authority. I do not concede that whatever process is 'due' an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case." [21]

If we limit this ruling to the facts before the court, we must conclude that the majority opinion in United States ex rel. Guagliardo v. McElroy [22] did not interpret it correctly. Circuit Judge Burger has stated, in his dissenting opinion, strong reasons for not agreeing with the majority.

### III

### Congressional Power

■ I am of the view that the Congress of the United States has authority to provide for *trial of civilian employees* for *non-capital,* non-military offenses, of the type here involved,—embezzlement or misappropriation of government funds. If it did not we would be confronted with a very dangerous situation.

19. Reid v. Covert, supra, note 9, 354 U.S. at pages 33–35, 77 S.Ct. at page 1239.

20. Reid v. Covert, supra, note 9, 354 U.S. at page 45, 77 S.Ct. at page 1245.

21. Reid v. Covert, supra, note 9, 354 U.S. at pages 76–77, 77 S.Ct. at page 1261.

22. United States ex rel. Guagliardo v. McElroy, supra, note 2.

At the present time, in certain encampments, there are as many civilian as military employees. Wherever a United States military establishment has a base, from Casablanca to Reykjavik to Honshu, they employ civilian employees. What substitute is there if the military cannot try a civilian employee in a particular outpost for the theft of government property or other crimes against the government?

Years ago we had extraterritorial courts in certain foreign countries under rights granted by treaty.[23] There was strong resentment for many years in China and other countries against the United States because, as late as 1948, we maintained such courts, to which an American living in such country could resort for trial in a civil or criminal case.

Absent extraterritorial American courts, what would be the alternative? To try civilian employees before a foreign court whose concept of justice is entirely different from ours, or bring them to the United States for trial? The latter has been done in the case of treason.[24]

But if we subjected the average civilian to the same procedure and compelled the Government of the United States to bring him to the United States, it would be an almost impossible task. We could not establish civilian courts to follow the military establishments with any practical success. It would mean that we would almost give to a civilian employee *carte blanche* to indulge in thievery of all kinds, and other non-military offenses. It would result in absolution, in advance, for many offenses because of the impossibility of dealing with them. Discharge from service would not be adequate.

Unless we recognize the right of these civilians to be tried by court-martial, for non-military offenses, we must grant them the right of trial by jury and the right to an indictment by a grand jury.[25] This could only be done if all proceedings took place in the United States.

For we cannot transport an entire judicial system to every area in which, with a foreign country's consent, we have military bases. An American civilian who goes to a foreign country has the protection of the United States. But that protection does not shield him from prosecution for a crime committed in a foreign country.

When one hires oneself out as a civilian employee to the Armed Forces, one acquires a number of benefits. He receives free transportation for himself and his dependents, his automobile and his furniture and household goods. The Government, to make for harmony and happiness, transports one's family. It gives him special allowance for quarters, as it does to soldiers. It makes provision for children and establishes schools for them.

Presumably, a person becomes a civil employee of the military establishment because he desires to have the bene-

**23.** 48 C.J.S. International Law § 9; Act of June 30, 1906, 34 Stat. 814, 22 U.S.C. §§ 191–200, creating the United States Court for China. See, Husar v. United States, 1928, 9 Cir., 26 F.2d 847; Casement v. Squier, 9 Cir., 1943, 138 F.2d 909. The sections relating to the American courts in China and elsewhere were repealed in 1948, after change in our treaties with China and other powers. Act of June 25, 1948, c. 646, § 39, 62 Stat. 992, effective September 1, 1948. The same statute repealed statutory provisions relating to consular courts in other countries, such as Turkey and Egypt, which the President had previously been given power to abandon by Section 182 of Title 22 U.S.C., 62 Stat. 992, § 39.

**24.** Kawakita v. United States, 1952, 343 U.S. 717, 733, 72 S.Ct. 950, 96 L.Ed. 1249; D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 348. And see, the writer's opinion in United States v. Archer, D.C.Cal.1943, 51 F.Supp. 708, 709.

**25.** Constitution of the United States, Amendments V and VI. None of these requirements apply to courts-martial. Kinsella v. Krueger, 1956, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342; Whelchel v. McDonald, 1950, 340 U.S. 122, 127, 71 S.Ct. 146, 95 L.Ed. 141.

fits that come with the employment. No one forces him into it, *as we do not induct civilian employees*. Those who volunteer to engage in this type of employment may be presumed to have done so with the knowledge that they are under the Military Code, and that, as civilian employees, they would be subject to trial by court-martial for such non-military offenses as they commit against the United States. And so no deprivation of rights is involved. If it is, it is the result of a voluntary surrender.

A person may waive a jury trial,[26] and may agree to be tried by a jury of less than twelve.[27] So it may be assumed that a person who becomes a civilian employee does so with the knowledge that if he commits certain offenses, he will be tried by court-martial. The right to indictment by Grand Jury and trial by jury should be deemed waived. That, in my view, is the rationale of the situation.

## IV

### Some Cases from Other Wars

Some very interesting cases arose during the First World War. One concerned a civilian employee charged with a non-military offense. Of the right to prosecute him under the then existing Articles of War, the Court said:

"It is a matter of common knowledge that Camp Jackson is a temporary cantonment, where troops are assembled from the various sections for the purpose of training preparatory for service in the actual theater of war. To hold that a cantonment like this is not within military jurisdiction would handicap the military authorities, and greatly hinder and delay military operations, and would, in some in-

stances, enable one employed in such capacity to successfully defraud the government without incurring any criminal liability whatsoever. We think that all persons serving there are strictly 'in the field' and subject to military regulations. The statute under which appellee was indicted is evidently intended to regulate the conduct of civilians who might seek employment in any branch of the service. This provision is highly proper, and manifestly intended to secure honest and fair dealing on the part of those employed by the government and should be rigidly enforced."[28]

The importance of this decision lies in the fact that the Court was presented with an opportunity of rendering a very narrow decision. What does "in the field" mean? Does it mean, *as well it might*, facing the enemy? Yet the Court held that a civilian employee, who was being trained for service "in the field", in the United States, was subject to court-martial.

Apposite to the discussion is the following language of Judge James M. Carter of this court in another case:

"Of necessity, a commander must have control over his entire force, including those who accompany his troops. Traditionally, he has accomplished this by the exercise of military jurisdiction over them, and this is the basis upon which the United States has geared its diplomatic agreements with foreign countries in which we have military bases. As a result of these arrangements, many of the concessions made to the civilian component of the force (e.g. tax and customs advantages, border crossing privileges,

---

26. Rule 23(a), Federal Rules of Criminal Procedure, 18 U.S.C. See, Schick v. United States, 1904, 195 U.S. 65, 71, 24 S.Ct. 826, 49 L.Ed. 99; Adams v. United States, 1942, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268; Echert v. United States, 8 Cir., 1951, 188 F.2d 336, 339, 26 A.L.R.2d 752.

27. Rule 23(b), Federal Rules of Criminal Procedure. See, Patton v. United States, 1930, 281 U.S. 276, 50 S.Ct. 253, 70 A.L.R. 263.

28. Hines v. Mikell, 4 Cir., 1919, 259 F. 28, 35, certiorari denied by the Supreme Court, 250 U.S. 645, 39 S.Ct. 494, 63 L. Ed. 1187.

etc.) are conditioned upon military jurisdiction over the civilians involve. Therefore, for our commanders to have no jurisdiction over this large group of American civilians now in foreign countries would be intolerable, and might well necessitate withdrawal of the civilian contingent. The effect on the military forces of such a withdrawal would be disastrous."[29]

Another case,[30] which also arose in World War One was decided by Judge Joseph C. Hutcheson, Jr., who is now the Chief Judge of the Court of Appeals for the Fifth Circuit. In that case one Jochen was employed as a civilian with the American forces along the Mexican border during the expedition when our army crossed into Mexico. While serving in the United States, at Brownsville, Texas, he was charged with violation of Article 2. He was tried and convicted. He sought release on a *writ of habeas corpus.*

Judge Hutcheson went fully into the question of military jurisdiction when exercised over civilians, writing:

> "That it is not necessary that a person be in uniform in order to be a part of the land forces, I think clear, not only upon considerations of common sense and common judgment, but upon well-considered and adjudicated authority." [31]

And again:

> "The history of the times, as embodied in legislation even affecting civilians, shows that extreme conditions demanded extreme measures. I need only refer to the Espionage Act, the acts against exportation, the act protecting the life of the President, the act authorizing the taking over of the railroads and the wire systems; all of these acts of Congress passed in times of emergency, and designed to compel the

individual to subordinate himself, temporarily at least, to things and activities of war conditions, shows the temper, the spirit, and the point of view of Congress so clearly and furnishes such an index to its composite mind, that it can with confidence be asserted that, when it used the words 'in the field,' it clearly intended them to have the meaning which long usage of the War Department had given to them. If more were needed to sustain this view, comparison of the act in question with the act which it superseded would furnish it.

> "Prior to the adoption of the present articles, on August 29, 1916, the Article of War more nearly corresponding to paragraph D, second Article of War, was the sixty-third article, reading as follows:

> " 'All retainers to the camp and all persons serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders according to the rules and discipline of war.'

> "The present article subjects to military law all persons attached to the armies of the United States without its territorial jurisdiction, irrespective of the * * * fact of the existence of war, and subjects all persons within the United States in time of war provided they were serving with the armies in the field." [32]

These cases are referred to because they show that jurisdiction over civilian employees of the Armed Forces has had long judicial recognition. They show that the courts in the past have sustained jurisdiction over civilians, although the persons involved were stationed in the United States, *where it would have been easy to try them before non-military courts.*

---

29. In re Varney's Petition, D.C.Cal.1956, 141 F.Supp. 190, 200.

30. Ex parte Jochen, D.C.S.D.Tex.1919, 257 F. 200.

31. Ex parte Jochen, supra, note 30, 257 F. at page 204.

32. Ex parte Jochen, supra, note 30, 257 F. at page 208.

## Summary and Conclusion

The Supreme Court in Reid v. Covert,[33] by declaring unconstitutional the application of the "dependents" clause to the wife of an officer charged with a capital offense *did not* intend to declare the clause as to civilian employees unconstitutional.

■ Absent a *binding* contrary ruling, I am of the view that the "civilian" clause in the statute under discussion is a proper exercise of Congressional power under the constitutional grant to make rules or regulations for the government of the Armed Forces,[34] or under the "necessary and proper" clause,[35] or both.

Invalidation of Congressional enactments by judicial fiat should be the rare exception. For this reason, Mr. Justice Frankfurter's concurrence was based on the assumption that the court was not determining the validity of the "civilian" clause.[36] So the situation calls for the application of the principle, already alluded to,[37] that if a statute covers several enumerated groups and is declared invalid as applied to *one group only*, the remainder survives, *provided it relates to different categories.*

For the "civilian" group is distinct from the "accompanying" (or dependents) group. Hence, the conclusion that the petition for writ of habeas corpus does not state grounds for the intervention of this court. The Order to Show Cause will be discharged. The Motion to Dismiss the petition will be granted, to be followed by a formal Judgment of Dismissal

33. Reid v. Covert, supra, note 9.

34. Article 1, § 8, Cl. 14, of the Constitution of the United States grants the Congress power
   "To make Rules for the Government and Regulation of the land and naval Forces";

35. The final clause of Article 1, § 8, gives power
   "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."
   This clause has become known as the "necessary and proper" clause.

36. Reid v. Covert, supra, note 9, 354 U.S. at page 45, 77 S.Ct. at page 1245. To the portions already cited from Reid v. Covert, supra, note 9, we add the following from Mr. Justice Black's opinion:
   "Even if it were possible, *we need not attempt here to precisely define the boundary between 'civilians' and mem-bers of the 'land and naval Forces.' We recognize that there might be circumstances where a person could be 'in' the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform.*" 354 U.S. at pages 22–23, 77 S.Ct. at page 1233. (Emphasis added.)
   This supports the conclusion reached here that even the majority of the court did not intend to determine the validity of the entire "civilian" clause.

37. See cases cited in note 18. The severability clause in the statute before us reads:
   "If a part of this Act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this Act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications."
   Pub.L. No. 1028, 84th Cong., 2d Sess., 70A Stat. 640, Aug. 10, 1956, § 49(d), 10 U.S.C.A. preceding section 101.